15 March 2000

No. 2--98--0717

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

__________________________________________________________________

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court

OF ILLINOIS, ) of Lake County.

)

Plaintiff-Appellee, ) No. 97--CF--3027

) 

v. ) 

) Honorable Henry C. Tonigan,

DEMETRIOUS WILSON, ) Christopher C. Starck, and

) George Bridges,

Defendant-Appellant. ) Judges, Presiding.

_________________________________________________________________

PRESIDING JUSTICE BOWMAN delivered the opinion of the court:

A jury found defendant, Demetrious Wilson, guilty of one count of first-degree murder (720 ILCS 5/9--1(a)(1) (West 1996)) and four counts of armed robbery (720 ILCS 5/18--2(a) (West 1996)).  Defendant filed a motion for a new trial, which the trial court denied.  Following a sentencing hearing, the court sentenced defendant to 40 years' imprisonment on the murder charge, to be served consecutively to a 15-year imprisonment term on one of the armed robbery counts.  The court imposed concurrent 8-year terms of imprisonment on each of the remaining armed robbery counts and ordered that those sentences be served consecutively to the 40-year murder sentence and the 15-year armed robbery sentence.  Defendant's motion for reconsideration of his sentence was denied, and defendant then filed this timely appeal.

On appeal, defendant contends that (1) the trial court abused its discretion in refusing to allow defense counsel an opportunity to argue to the jury whether defendant was accountable for the offense of murder after a jury query, during its deliberations, prompted the court to further instruct the jury regarding accountability; (2) the prosecution improperly vouched for the veracity of the testimony of a key witness by eliciting that the witness's plea agreement required him to testify truthfully; (3) the trial court erred in ordering that defendant's sentence for murder run consecutively to the sentences for armed robbery because the "triggering offense," the armed robberies, although Class X offenses, did not involve severe bodily injury as is required for the imposition of consecutive sentences for offenses committed as part of a single course of conduct; and (4) the trial court erred in imposing a 15-year sentence for one of the armed robbery counts and ordering it to run consecutively to the other 8-year armed robbery sentences, as all of the armed robberies were part of a single course of conduct.  Issues two through four are addressed in a nonpublished portion of this opinion.

On the evening of October 31, 1997, Jermaine Price, David Taylor, Deon Tramble, and Alexius Brooks went to an apartment located at 2102 Barrett in North Chicago, where Brandy Owen, Patricia Amann, Keith Calvert, and Jemeil Amlet were already present.  Price testified that, shortly thereafter, Calvert mentioned something about "putting up the heat."  Price interpreted this comment as meaning that Calvert had a gun on him and that he was going to "put it up."  Calvert and Amlet left, returning with defendant, who appeared slightly intoxicated.  At that time, Price, Tramble, Owen, and Amann were seated on the floor playing cards.

Price testified that defendant and Owen decided to exchange sweatshirts.  Defendant removed his sweatshirt, exposing a gun in a shoulder holster.  Owen became upset because her children were present in the house.  Defendant then pulled the gun from the holster, saying, "This ain't s---.  This ain't nothing."  Defendant then discharged the gun four to six times into the floor around the area where the group had been playing cards.  Price recalled that, as defendant started shooting, Amann ran out of the apartment.  

Calvert and Amlet went to the kitchen, returning with knives.  Defendant instructed Taylor, Tramble, and Price to empty the contents of their pockets onto the floor, and Calvert and Amlet  picked up the items off the floor.  Defendant demanded that Price, Taylor, and Tramble drop their trousers.  

Defendant then went into the kitchen, where Brooks was sitting at the kitchen table, either sleeping or passed out, and woke up Brooks.  Price stated that Calvert and Amlet were standing next to defendant at this time.  Price had a clear view of the kitchen, as the apartment was small and the kitchen and living room were together.  When the men got Brooks to his feet, he came and stood next to Price, emptied his pockets, and also dropped his trousers.  When Brooks pulled out his car keys, Amlet snatched them.  Then Calvert and Amlet left the apartment, followed by defendant.  

Price recalled that Taylor commented that defendant's gun was not real, but fake, because it sounded like a cap gun.  Price disagreed, saying that he saw fire coming from the end of the pistol.  Taylor left the apartment with Tramble right behind him.  Price stated that as he exited the apartment he heard several gunshots and ran back into the apartment.  When the shots stopped, he went down the stairway leading to the outside of the building.  As he exited the front door of the building, he saw Taylor take a few steps and fall into Tramble's arms.  As Tramble lay Taylor down on the ground, Price saw blood on Tramble's shirt.

Deon Tramble's testimony was substantially the same as Price's.  According to Tramble, Calvert and Amlet left the apartment twice before returning with defendant.  Prior to leaving the first time, Calvert talked about a gun he had hidden in the bushes. 

Tramble recounted that after defendant fired his gun, which Tramble believed was a .45, about four times, one of the other guys with him declared, "[T]his is a m------f------ robbery."  Tramble related that after he, Taylor, and Price had emptied their pockets and dropped their trousers, "they" (defendant, Calvert,  and Amlet) approached Brooks, who was "still asleep or whatever" and pointed the gun at his face.  They took his car keys and any money he had and then left.  According to Tramble, defendant exited the apartment first, followed by Calvert and Amlet.  

Tramble stated that, because defendant had fired his first shot close enough to hit the woman sitting on the floor and nothing had happened and no holes could be seen in the floor, he and Taylor thought defendant had been firing blanks.  Therefore, Taylor ran out the door and down the stairs.  Tramble picked up a bottle and ran behind him.  As he approached the front door, Tramble thought he heard a shot fired.  He then saw Taylor running back towards him.  Taylor had a bullet wound in his chest.  Taylor collapsed, and Tramble caught him.

Tramble stated that he never saw anyone besides defendant with a gun in his hand.  He never saw defendant put the gun down.

Brandy Owen testified that on the evening of October 31, 1997, she had a birthday party for Patricia Amann, who was going to be 16.  Amann had invited a few friends from school as well as a couple of people her age from the area.  Owen had invited Brooks, her ex-fiancee.  When Brooks arrived, he was accompanied by Price, Tramble, and Taylor.  Owen stated that Calvert and Amlet were present at the time the other men arrived, but Calvert left immediately thereafter, claiming that his gun was outside in the bushes and that he was taking it home.  He returned about 5 or 10 minutes later, and then he and Amlet left.  About one hour later they returned with defendant.  

Owen's testimony regarding what transpired after the arrival of defendant did not differ substantially from that of Price and Tramble.  It differed only in that she stated that defendant's gun was tucked into the front of his jeans and that he discharged it about eight times, although that was an estimate.  Owen said that when defendant started shooting, she pushed herself back against the wall by the side of the couch.  From her location she could not see Calvert or Amlet and did not have a full view of Price, Tramble, and Taylor.  She heard defendant tell them between shots to empty their pockets and lower their trousers.  

Then, defendant approached Brooks, who was alseep at the kitchen table.  Owen said that she had a full view of defendant and Brooks.  Owen recalled:

"And I don't know if he [defendant] had smacked him [Brooks] in the head or if he had hit him with the gun in the head, but he had woke Lex up anyway, and Lex didn't know, he wasn't aware of what was going on.  And, you know, all he knows is this guy has a gun, and ***."

According to Owen, when defendant ordered Brooks to empty his pockets and drop his trousers, Brooks "kind of laughed" and asked, "[W]hat are you talking about?"  Defendant raised his gun up to Brooks.  Brooks then gave defendant his car keys, telling defendant that was all he had.  Defendant took the keys and fled the apartment as did Calvert and Amlet.  Owen did not know the order in which the offenders left.  She discovered that Amann had left the apartment as soon as the shooting had started.  

Owen remembered that Calvert left her apartment prior to the time that he and Amlet left together and then returned with defendant.  On that prior occasion, Calvert stated that he had a gun and had to do something with it.  

Brian Carder, an evidence technician from the North Chicago police department, testified that he recovered six expended .45-

caliber shell casings in Owen's apartment, five from the living room floor and one from the kitchen area.  Carder found four bullets in Owen's apartment and one in the apartment below.  Carder also found a shell casing near the rear entrance to the apartment building, which was directly across from the building where Owen's apartment was located.  According to Carder, the shell casing found outside was a different brand from those recovered in Owen's apartment but different brands of .45-caliber ammunition could be fired out of the same gun.  Carder stated that no gun was recovered.

Patricia Amann's testimony regarding the events of the evening leading up to defendant's arrival was similar to Owen's.  However, Amann believed that Brooks and his three friends were already present at Owen's apartment when Calvert and Amlet first arrived, although Calvert and Amlet just "ran in and out."  When they returned with defendant, Amann, like Owen, thought that defendant's gun had been tucked in his pants.  Amann said the gun was visible as soon as defendant removed his overcoat.  

Amann recalled that, when defendant started shooting, she ran out of the apartment door, down the stairs, through the front door of the building, across the sidewalk, and into a neighboring building.  She sat on the stairs inside that building.  Amann testified that while she was sitting on the stairs she heard "at least one gun shot" and then the apartment building door opened.  Defendant, Calvert, and Amlet entered and went up the stairway on which Amann was sitting.  She did not remember seeing anything in anyone's hand.  The three men said, "[G]o, just go."  Amann fled out the door and returned to Owen's apartment building through the back entrance.  

Fifteen-year-old Jemeil Amlet testified that, as a result of his involvement with defendant and the events that occurred on the evening of October 31 and early morning of November 1, 1997, he had been charged with armed robbery.  Amlet stated that he had pleaded guilty to attempted armed robbery.  As a condition of his plea agreement, Amlet could receive probation.  If incarcerated, he could receive no more than a five-year term of imprisonment.  Also, Amlet was to provide truthful testimony.  

Amlet recalled that Calvert and he were at Owen's apartment when Brooks and his three friends arrived.  Sometime thereafter, Calvert said he had to "put his thing in the bushes" because of the presence of Owen's children.  Prior to that statement, Amlet did not see a gun in Calvert's possession.  Calvert left and returned within two to three minutes.  Amlet and Calvert then left together to purchase some marijuana.  After obtaining the marijuana, they encountered defendant and invited him back to Owen's apartment.

At the apartment Amlet went to the kitchen to roll the marijuana.  Calvert sat on the couch next to Brooks, who was passed out.  Amlet heard Owen say, "Get that out of my house."  He did not know what she was talking about.  He thought she was referring to drugs.  Then he heard a gunshot, and defendant proceeded to run around the apartment, shooting at the feet of those present.  Calvert ordered, "Lay it down," which meant to empty one's pockets.  Amlet picked up the money that was dropped on the floor while defendant held everyone at gunpoint.  Amlet denied ever grabbing a knife from the kitchen.  

According to Amlet, defendant then turned his attention to Brooks.  He approached Brooks, snatched his keys, pushed him back down and shot at his feet one time.  Calvert, defendant, and Amlet ran out of the apartment.  Amlet stated that when he entered the hallway Calvert had already gone out the front door of the apartment building.  Amlet stated that he never saw Calvert after that.  

Outside, Amlet was a "long" distance behind defendant, but he followed him toward the back of another apartment building.  Amlet said that defendant opened the door of the building, looked back, and fired the gun in Amlet's direction.  Amlet flinched.  The gunshot struck Taylor, who was about three feet behind Amlet, in the chest.  Amlet saw Taylor "hug" himself, turn, run back towards the building, and then fall.  Amlet did not go inside the building that defendant had entered.  

On cross-examination, Amlet maintained that he only picked up the money on the floor because defendant ordered him to retrieve it.  Amlet acknowledged that he knew that a person charged with armed robbery was ineligible for probation and could receive from 6 to 30 years' imprisonment.   Amlet denied that his attorney told him that if he testified the way the State wanted him to testify, the State would not recommend a prison term at his sentencing hearing.

Amlet admitted that Calvert was a long-time friend and that Calvert declared to everyone in the apartment that he was "strapped," 
i.e.
, carrying a gun.  Amlet maintained that neither he nor Calvert threatened anyone with a knife.

Subsequent to Amlet's testimony, stipulations as to certain testimony were read to the jury.  It was stipulated that if Dr. Mark Witeck, a forensic pathologist, were to testify, he would state that Taylor died as a result of a gunshot wound in his chest.  Robert Wilson, a firearms examiner for the Northern Illinois police crime laboratory, would state that he examined seven bullets, including the one removed from Taylor.  All were of .45 caliber and possessed similar class characteristics, although the mutilation of the bullets precluded any comparison of individual characteristics.  Wilson would also testify that he examined seven cartridge casings, all of .45 caliber, and that they were fired from the same unknown firearm.  

The State rested its case.  Defendant did not present any evidence.  

During the jury instruction conference that followed, the court pointed out that the accountability instruction would pertain only to the armed robbery charges and not to the murder charge and, therefore, the State was precluded from arguing defendant's accountability for the murder.  The defense requested that the accountability instruction be modified to indicate that it specifically applied to the armed robbery charges and not the murder charge.  The State responded that the accountability language was not included in the murder instruction, that it was "quite obvious" where the accountability lay in the case, and that the jurors would have no problem understanding that fact.  The court determined that a separate paragraph should be added to the  accountability instruction, stating that the instruction applied only to the armed robbery counts and not to the murder count.

During their closing arguments, neither the prosecution nor the defense argued that the accountability theory applied to the murder charge.  After the jury had been deliberating approximately 10 hours, it sent a query to the trial judge that asked whether the language "performed the acts" in the issues instruction for murder meant that defendant had to actually pull the trigger or whether "his participation in a criminal activity which resulted in the death of the victim [could] be sufficient to support the charge."  The court and the parties construed this question as asking whether the accountability theory applied to the murder charge.

The State posited that the defense had "opened" the door for an accountability instruction on the murder charge by presenting, during its closing argument, the scenario that Calvert was involved in the murder.  The court agreed.  Defense counsel vigorously disagreed, arguing that the evidence opened that door and that the defense was entitled to use the evidence to offer another potential scenario for the murder.  Defense counsel contended that if the accountability instruction were allowed, it would "change[] our whole argument to the jury."  Counsel maintained that because the original accountability instruction submitted to the jury had been agreed upon by the parties, the court's response to the jury's question should be that it had heard the evidence and that it should follow the instructions given.  

The defense further maintained that, if the court were to give an accountability instruction now, it would be placed in a "bad spot" because the instruction "may benefit the State."  Moreover,  the defense asserted, it might have couched or changed its whole argument or approach to the case had it known the instruction would be given.  The defense argued that the instructions already tendered to the jury were based on the evidence presented, that there had been no evidence that anybody other than defendant did the shooting, and that the instructions were consistent with the evidence.  The court stated that, prior to defense counsel's argument, it would have agreed.  But, by arguing that there could have been another shooter, the defense had raised a question in the jury's mind regarding whether somebody else fired the shots.  The court commented that, if the jurors believed the defense's argument and if the evidence showed someone else did the shooting, then defendant would be, or could be, responsible for the conduct of that person.   The court advised the parties it was going to give the jury the following instruction:

"A person is legally responsible for the conduct 
of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of the offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense.

You may consider this instruction with respect to the First Degree Murder charge.

Please consider this along with the other instructions."

Defense counsel commented that he had a "real problem" with the instruction because, had "the instruction been available," there were a number of different arguments the defense could have made to the jury regarding the interpretation of the instruction or how the jurors should consider it. 
 Counsel further commented that, if the instruction was being submitted to the jury to allow it to make an accountability finding on the murder charge, then all of the instructions pertaining to the murder charge were "wrong" and should be redone.  The court responded that it had considered altering the murder instructions but that it thought giving the accountability instruction was the "less invasive and less confusing" approach.  The defense asked the court to note its objection to the instruction.  The instruction was submitted to the jury.

The court then received another note from the jury.  Accompanying the note were the accountability instruction included in the original jury instructions and the accountability instruction just given to the jury.  The note asked if the statement in the original accountability instruction indicating that the instruction applied only to the armed robbery charges and not to the murder charge was in conflict with the statement in the recently tendered instruction indicating that the jury could consider the instruction with respect to the murder charge.  The court stated that it was going to tender another accountability instruction that would include the direction that the jurors could consider the instruction with respect to both the armed robbery charges and the murder charge and that they should disregard any prior limitation with respect to which charge the instruction applied.

The defense argued that no evidence had been presented that defendant had solicited, aided, abetted, agreed to aid, or attempted to aid someone else in shooting the victim and that there had to be that evidence presented in the case before the instruction could be given.  The court responded that defense counsel had drawn the inference from the evidence that another person had a gun and that he had fired it.  Counsel retorted that there had been no inference, however, that defendant aided, abetted, agreed, solicited, or acted in concert with someone else in shooting the victim.  

The court submitted the revised instruction to the jury over the defense's objection.  About an hour later the jury returned its verdict.  Prior to hearing the verdict, the defense reiterated its position that the State's theory of guilt was that defendant shot the victim and that, therefore, the accountability instruction as to murder should not have been tendered to the jury, especially when defense counsel never had a chance to argue why defendant could not be guilty under an accountability theory.  The defense maintained that, notwithstanding the fact that the jury apparently had reached a verdict, the court should either instruct the jury to disregard the accountability instruction as to the murder charge or bring the jury back out and allow defense counsel to argue against the theory.  The defense stated that, if the court was not going to allow either of these requests, it was moving for a mistrial.  The court denied the defense's request and also denied its motion for a mistrial.

The jury returned guilty verdicts as to the first-degree murder charge and all four counts of armed robbery.  

Subsequently, at the hearing on defendant's motion for judgment notwithstanding the verdict or for a new trial, defense counsel asked the court to set aside the guilty verdict on the murder charge, arguing once again as he had at trial that the court should not have changed the jury instructions and allowed an accountability instruction as to the murder charge when the defense had not had an opportunity to argue against the accountability theory.  The trial court denied the motion.  This appeal ensued.

Defendant first contends that the trial court abused its discretion when a jury query, during the jury's deliberations, prompted the court to provide an instruction on a theory of liability that defense counsel had not had an opportunity to argue against during his closing argument.  Defendant maintains that the inability to address this theory denied him a fair trial.   

Jury instructions are intended to inform the jury as to the correct principles of law applicable to the evidence admitted at trial.  
People v. Willis
, 217 Ill. App. 3d 909, 921 (1991).  The trial court has a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion.  
People v. Banks
, 287 Ill. App. 3d 273, 288 (1997).  However, a trial court may exercise its discretion and properly decline to answer a jury's questions when the instructions are readily understandable and sufficiently explain the relevant law, further instructions would serve no useful purpose or would possibly mislead the jury, the jury's inquiry involves a question of fact, or an answer by the court would likely direct a verdict one way or the other.  
People v. Tomes
, 284 Ill. App. 3d 514, 518 (1996).  Also, the court should not submit new charges or new theories to the jury after the jury begins its deliberations.  
People v. Gramc
, 271 Ill. App. 3d 282, 288-89 (1995).

As defendant points out, the State's theory at trial was that defendant shot Taylor.  The testimony established that all the victims of the armed robbery, as well as Brandy Owen, had observed defendant with a gun during the armed robberies and as he fled from Owen's apartment.  Codefendant Amlet testified that he saw defendant shoot Taylor.  No evidence was presented to show that defendant solicited, aided, abetted, agreed to aid, or attempted to aid another person in shooting the victim.  Given the foregoing evidence, defendant's only possible theory of defense was to try to draw inferences from the evidence that Amlet had lied and that codefendant Calvert could have been the shooter and then to argue such inferences to the jurors. 

Evidence was presented to show that codefendant Amlet had made a plea agreement with the State.  In return for testifying truthfully he would plead guilty to the lesser charge of attempted armed robbery.  The evidence also showed that, prior to the night of the offenses, Amlet had not known defendant, but Calvert and Amlet were long-time friends.  According to Amlet, Calvert was the first one to leave Owen's apartment following the robbery and was already out the front door of the apartment building by the time Amlet exited the apartment.  Amlet said that he did not see Calvert again that night.  Amlet testified that he followed defendant out of the apartment building and that, as defendant approached the rear of another apartment building, defendant fired and shot Taylor, who was only about three feet behind Amlet, in the chest.  According to Amlet, he did not follow defendant into the building.   Based on the foregoing testimony, the defense argued that Amlet had reasons to lie because he had made an agreement with the State in return for his testimony against defendant and because he and Calvert had been friends for a long time.  Additionally, the defense pointed out inconsistencies in Amlet's testimony, in particular, between his testimony and that of Patricia Amann, who appeared to have no reason to lie.  Amann testified that she was sitting on the steps of the apartment building and heard at least one shot, after which defendant entered the building.  According to Amann, Amlet and Calvert also entered, and all three men fled up the stairs past her.  

During its summation, the defense also questioned the feasibility of Amlet's not being hit by gunfire if Taylor was such a short distance behind him at the time defendant allegedly turned and fired at the victim.  Additionally, the defense reviewed the testimony presented by Price, Tramble, Owen, and Amlet indicating that Calvert stated he was carrying a gun, which, according to Tramble and Amlet, Calvert hid outside in the bushes prior to the robbery.  The defense inferred from all this testimony that Calvert rather than defendant could have been the shooter.  

Arguments and statements based upon the facts and evidence, or upon reasonable inferences drawn therefrom, are within the scope of proper closing.  
People v. Brown
, 275 Ill. App. 3d 1105, 1114 (1995).
  Under the particular facts of this case, the defense's arguments and statements were based upon reasonable inferences drawn from the evidence.  Unlike the trial court's conclusion, we do not believe defense counsel's argument gave rise to an inference that defendant had aided, abetted, or had acted in concert with anyone else in shooting the victim.  The evidence pertaining to the murder charge did not support the accountability instruction.  The State and the defense were advocating an all-or-nothing decision, 
i.e.
, either defendant shot Taylor or he did not.  By tendering the accountability instruction, the court interjected into the case a theory that was contrary to the theories of the defense and the State and, perhaps, allowed the jury to avoid making the difficult decision of whether defendant had been proved guilty beyond a reasonable doubt of murder by settling for a compromise decision based on a theory that the defense had had no chance to address.

We conclude that, because the defense never had the opportunity to argue accountability as it pertained to the murder charge and because the jurors' query after 10 hours of deliberation implied that they had not yet reached a verdict on the murder charge and had some concerns as to whether defendant was the shooter, the trial court abused its discretion in submitting an instruction that presented a new theory.  See 
People v. Jamison
, 207 Ill. App. 3d 565 (1991) (trial court's supplemental instruction on accountability after the jury began deliberating allowed the defendant to be convicted on a theory not addressed at trial and constituted an abuse of the court's discretion).  We are cognizant that the State also did not have an opportunity to argue accountability, but defendant was far more prejudiced by the defense's inability to address the inapplicability of this theory than was the State.  Allowing the instruction provided the State with two theories on which the jury could base its finding of guilty of murder rather than on the single original theory presented at trial that defendant shot the murder victim.  As defendant was possibly convicted upon a theory that he was never given a chance to address, we believe he was denied a fair trial. 

We find support for our determination in a very recent decision of our supreme court.  In 
People v. Millsap
, 189 Ill. 2d 155 (2000), the supreme court reached a similar result.  In 
Millsap
, the defendant was charged with home invasion and robbery.  
The evidence suggested that there had been more than one offender.  The State did not pursue an accountability theory, nor did it request that the jury be instructed on accountability.  Also, neither party argued accountability during closing argument.

After the jury began its deliberations, the jury sent a note to the court asking, "Is the accomplice just as guilty at [
sic
] the offender who causes an injury in a home invasion?"  189 Ill. 2d at 159.  The court proposed answering the query by instructing the jury on accountability.  Defense counsel objected, arguing that no evidence regarding the elements of accountability had been presented and that he had had no opportunity to argue about accountability.  Counsel suggested that the jurors be told that they already had everything.  The trial court gave the jury an accountability instruction.  Subsequently, the jury found the defendant guilty on both charges.  The defendant's convictions were affirmed on appeal.

The supreme court determined that, by instructing the jury on accountability after the jury had commenced its deliberations, the trial court had entirely deprived defendant's attorney of an opportunity to defend against that theory.  The supreme court pointed out that the jury's question indicated that it had some doubt as to whether the defendant had been the person to injure the victim based, apparently, on the jury's belief that there had been a second intruder and that defendant could have been the second intruder.  However, as the court noted, defendant had not had a chance, nor would he have had any reason, to argue against the second-intruder theory because no accountability instruction was given.  The State's theory was that the defendant was the person who injured the victim, and that was the theory it argued to the jury.

The supreme court found that the trial court should have answered the jury's question by telling the jurors to apply the instructions they had and to keep deliberating.  According to the court, the State had chosen to charge the defendant as a principal and to argue that he was guilty as a principal and, therefore, the trial court should not have submitted a new theory to the jury for its consideration after it had begun deliberating.

The supreme court also rejected the State's argument that, because the defendant's defense was that he had nothing to do with the offense, the instruction was harmless.  The court pointed out that the defendant was possibly convicted based upon a theory he never had an opportunity to controvert during closing argument.  Consequently, defendant was deprived of his due process right to a fair trial.

Based on the decision in 
Millsap
, defendant's conviction of first-degree murder is reversed.

[Nonpublishable material removed under Supreme Court Rule 23.]

In the nonpublished portion of the opinion, we affirmed the judgment of the circuit court of Lake County finding defendant guilty of armed robbery and modified his sentence of imprisonment on the armed robbery conviction of Brooks to a term of eight years to run concurrently with the other armed robbery convictions.  For the reasons stated above in the published portion of the opinion, we reverse defendant's conviction of first-degree murder and remand the cause for a new trial on this charge.

Affirmed in part as modified; reversed in part and remanded.

HUTCHINSON and GALASSO, JJ., concur.