# Illinois Official Reports

## Appellate Court

*People v. Peoples*, 2015 IL App (1st) 121717

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES PEOPLES, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-12-1717 |
| Filed | June 30, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-15238; the Hon. Angela Munari Petrone, Judge, presiding. |
| Judgment | Affirmed in part; reversed in part; mittimus corrected; and cause remanded with directions. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, Patrick Morales-Doyle, and Rachel Moran, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Tasha-Marie Kelly, Brian Hodes, and Paul J. Connery, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment and opinion. |

**OPINION**

¶ 1        This case involves a drive-by shooting on the south side of Chicago that turned into a shootout between the offenders and the targets along two city blocks. After a jury trial, defendant James Peoples was convicted of first-degree murder and two counts of attempted first-degree murder and sentenced to an aggregate term of 70 years' imprisonment. For the reasons that follow, we reverse defendant's first-degree murder conviction and remand for a new trial. We affirm the attempted murder convictions. We affirm the sentences for attempted murder and order the mittimus corrected.

¶ 2        Defendant raises several issues on appeal. First, he contends the State failed to prove him guilty beyond a reasonable doubt because there was no physical evidence connecting him to the crime, and the State's witnesses were not credible for various reasons. He argues that the trial court erred in responding to the jury's request for a definition of reasonable doubt by stating, "Reasonable doubt cannot be defined for you. That is for you to determine." He also claims that the trial court abused its discretion by denying his request for a continuance to obtain a presumably neutral witness's testimony that would have corroborated a defense witness's testimony. We reject these arguments.

¶ 3        We agree, however, that the trial committed reversible error when, in its response to another jury question, the trial court injected into the trial a theory of guilt by accountability. The State charged defendant with first-degree murder only as a principal shooter and did not, at any time, argue that defendant was guilty on an accountability theory. Defendant's murder conviction must be reversed and remanded.

¶ 4        Defendant also raises three issues regarding his sentence. He first argues that his sentence was excessive. We disagree that the remaining sentence, after our reversal of the murder conviction and sentence, was excessive. The State agrees with defendant's additional two arguments regarding presentence credit and fines. There is no dispute that the mittimus should be corrected to reflect a presentence credit, for the days spent in presentence custody, of 1,722 days (instead of 1,535 days), and the fines, fees, and costs order should reflect an outstanding balance of $530. We order the mittimus corrected accordingly.

¶ 5                                                          I. BACKGROUND

¶ 6        On June 27, 2007, at approximately 12:30 a.m. in the vicinity of 73rd Street and South Stewart Avenue in Chicago, a shootout occurred involving several individuals. As a white van drove by 7308 South Stewart Avenue, several gunshots were fired at the porch, and gunfire was returned by the intended targets. Roosevelt Wilson, who had been standing on the sidewalk, was shot in the head and died. As the van continued southbound on South Stewart Avenue toward 75th Street, two individuals followed and opened fire at the van.

¶ 7        Shortly thereafter, Chicago police officer Richard Griffin went to St. Bernard's Hospital in response to a call of a person with a gunshot wound. When Officer Griffin arrived at the hospital, he saw defendant sitting on a gurney soaking his hand in a solution. After detectives arrived and interviewed defendant, the police took defendant into custody and brought him to the police station.

¶ 8        On July 23, 2007, defendant was charged by indictment with the first-degree murder of Roosevelt Wilson, as well as the attempted first-degree murder of Taft Wilson, the attempted

first-degree murder of Michael Watson, and aggravated discharge of a firearm. Prior to trial, the court heard and denied defendant's motion to quash his arrest and suppress evidence and his motion to suppress statements. Defendant was tried before a jury from May 31 to June 3, 2011. A summary of the relevant testimony follows.

¶ 9                                    A. State's Case-in-Chief

¶ 10        The State's evidence included testimony from six occurrence witnesses: Roosevelt Gray, Taft Wilson, Michael Watson, Shawn Bowens, Willie Thomas, and Antoinette Burrage. Three of these witnesses, Taft Wilson, Michael Watson, and Shawn Bowens, identified defendant as an occupant of the white van. Because defendant argues on appeal that these three State witnesses contradicted each other, testified incredibly regarding their own involvement in the crime, and had a motive to curry favor with the State in relation to their own criminal acts by falsely accusing defendant, we will consider their testimony in detail.

¶ 11                                    1. Taft Wilson

¶ 12        Taft Wilson testified that he lived at 7308 South Stewart Avenue with his mother, three brothers, and sister. Michael Watson was his brother, and Roosevelt Wilson and Roosevelt Gray were his cousins. On June 27, 2007, at 12:30 a.m., he was standing to the side of his house talking with his cousin, Roosevelt Wilson, when he heard Shawn Bowens, who was standing on a porch across the street, shout a warning that a white van was approaching with its passenger side door open.

¶ 13        Taft Wilson further testified that there was a light on inside the van, and he recognized the individuals in the van because they were his friends, had all attended the same school, and were about the same age as him. The individuals he saw in the van were defendant (nicknamed Midget), Robert Davis (nicknamed Snuggles), Kevin Stanley (nicknamed K-Up-Slow) and Dimarko (whose last name he did not know). He testified that he could see defendant aiming a gun at Roosevelt Wilson and him. He saw Robert Davis in the front passenger seat, Kevin Stanley behind the driver, and Dimarko in the third row of the van. He testified that defendant fired three to seven shots at him and Roosevelt Wilson (although he initially told police that it was three to five shots). He "ducked down" for about seven seconds. When he got up, he saw Roosevelt Wilson lying on the ground. Taft Wilson then fired a semiautomatic 9-millimeter pistol at the van six times. He chased the van as it slowly travelled south. After firing at the van, Taft Wilson ran inside his house and called 911. He stated that he had "found" the gun he fired that night. He initially told the police that he put the gun in a sewer following the incident but later admitted that he gave it to Roosevelt Gray.

¶ 14        Although Taft Wilson testified that he had not seen the white van before, he admitted that he had told the police that he had seen the white van earlier. At trial, he stated that he had not paid close attention to the van. He also testified that, five minutes before the shooting, he saw Robert Davis drive by as the passenger in a green Grand Am. Taft Wilson also testified that his brother, Michael Watson, was not in the area during the shooting. He claimed he did not see his brother riding a bicycle that night, and that his brother returned home on foot after the shooting.

¶ 15                                   2. Michael Watson

¶ 16      Michael Watson testified that he also lived at 7308 South Stewart Avenue and was outside at 12:30 a.m. on June 27, 2007. Moments before the shooting, with his brother, Taft Wilson, present, Roosevelt Wilson asked Watson to go purchase some cigarettes for him. As Watson began to leave on his bike, he heard someone shout to watch out for a van.

¶ 17      Watson saw the light inside the van come on and heard shots. Watson testified that the van was travelling at a slow speed, and he saw defendant and Robert Davis shoot at Watson's family members in front of his house. He testified that they fired "numerous shots" and it "was a crossfire." In contrast to his brother's testimony, he stated that Robert Davis was behind the driver's seat, defendant was behind the front passenger seat, and Kevin Stanley was in the front passenger seat. Watson jumped off his bike and took cover behind a car as the van "slowly rolled" toward him. They started firing at Watson, who returned three or four shots with a semiautomatic 9-millimeter pistol. Watson testified that he followed the van on his bicycle to get the license plate number but was unsuccessful because the van picked up speed and ran the stop sign. Watson went home where he saw his cousin, Roosevelt Wilson, on the ground, unresponsive. Watson said he went inside his house and watched the scene from his window.

¶ 18      Similar to his brother, Watson claimed that he "found" the gun he used. He testified that he found it in a lot next to his house "15 seconds" before the shooting started. Watson testified that his younger brothers and his daughters played in that lot, and he picked up the gun out of concern for the children's safety. He testified that he put the gun in a sewer after the incident.

¶ 19                                   3. Shawn Bowens

¶ 20      Shawn Bowens was the third witness to testify that he saw defendant in the white van. At the time of trial, Bowens was incarcerated for a parole violation. Bowens had a pending felony charge being prosecuted by the Cook County State's Attorney's office. He also had prior convictions for aggravated unlawful use of a weapon, unlawful use of a weapon by a felon, possession of a controlled substance, and possession of a controlled substance with intent to deliver.

¶ 21      Bowens testified that, on June 27, 2007, at about 12:30 a.m., he was at 7308 South Stewart Avenue, his friend Taft Wilson's house. Roosevelt Wilson, Roosevelt Gray, and Taft Wilson were outside. Bowens stated that he was on the front porch of 7308 South Stewart Avenue with Blair Davis. This testimony contradicted that of Roosevelt Gray and Taft Wilson, who said that Bowens was across the street, on the east side of South Stewart Avenue, when Bowens warned them about the approaching van. Bowens testified that at no time that night was he across the street from Taft Wilson's house, although he later admitted that he had told the grand jury that he had been across the street earlier that night, before he sat on the porch.

¶ 22      Bowens testified that, while he was sitting on the porch, he noticed a white van and saw the sliding door open on the rear passenger's side. He stated that the interior lights were on inside the van and he saw defendant, Robert Davis, Kevin Stanley, and Dimarko Jones in the van, but placed them in a configuration that was different from both Taft Wilson's and Michael Watson's testimony. Bowens testified that Jones was in the front passenger seat, and the other three men were in the van's back row. He later admitted that he told the grand jury that Davis, not Jones, was in the front passenger seat. Bowens testified that defendant got up and moved toward the door of the van, so he shouted to watch out for the van. Bowens then went inside the house, where he stayed until the shooting ended. Bowens heard about four gunshots coming

from the van and then, in a matter of seconds, he heard a second set of 25 to 50 shots coming from the area right next to him where Taft Wilson and Roosevelt Wilson had been standing. When Bowens came back out, he saw Taft Wilson with a gun.

### 4. Roosevelt Gray

Roosevelt Gray, who was Roosevelt Wilson's son, testified that he was present at the scene but did not identify anyone in the van. He testified that he was walking from his car toward the front porch of 7308 South Stewart Avenue, where his cousins, Taft Wilson and Michael Watson, lived. Roosevelt Wilson and Taft Wilson were standing on the sidewalk, just south of the house. Blair Davis was on the porch. As Gray ascended the stairs, he heard Shawn Bowens, who was across the street on the east side of South Stewart Avenue, shout to "watch out" for the van.

Gray testified that he saw a person hanging from the van but he could not "tell anything about the people inside." He dropped to the ground on the porch and heard "a lot" of gunshots coming from the van and additional gunshots "going back towards the van." After the gunshots stopped, Gray got up and found his father lying on the ground, shot in the head. He followed the ambulance to the hospital, where he learned that his father had died.

### 5. Willie Thomas

Willie Thomas, a retired Chicago police officer who lived at 7338 South Stewart Avenue, witnessed the incident from his front porch. At around 12:30 a.m., he heard gunshots in the area of 73rd Street and South Stewart Avenue. He saw "what looked like a gray van accelerate hard heading south towards 74th." Thomas testified that he saw a black male hanging out of the van's passenger side sliding door, facing backwards, firing a handgun back toward the north as the van travelled south. Two black males chased the van returning fire, one on foot and the other on a bicycle. The van went to the area of 75th Street and South Stewart Avenue. Thomas then heard additional gunshots from the vicinity of 75th Street and South Stewart Avenue. Shortly thereafter, Thomas saw a man riding a bicycle north toward 73rd Street, with a second man riding on the handlebars. The man on the handlebars appeared to be the same person who had chased the van on foot. When they reached the area of 7300 South Stewart Avenue, the two men took off their shirts and discarded them. Thomas called 911, flagged down the tactical unit, and spoke to the officers on the scene that night. However, Thomas was unable to identify the shooter in the van or the two men who chased the van and returned on the bicycle.

### 6. Antoinette Burrage

Antoinette Burrage testified that defendant was her boyfriend. On the night of the shooting, she had an argument with defendant while at 75th Street and South Stewart Avenue. Burrage left him and went to the other side of South Stewart Avenue. Shortly after midnight, she was standing at the bus stop at 75th Street and South Stewart Avenue with two female friends when she heard gunshots. She testified that the gunshots came from the direction of "73rd, 72nd and Stewart." After somebody said the shots were headed toward 75th Street and South Stewart Avenue, everybody scattered, including Burrage. She and her two friends hid in a basement stairwell in a backyard until they heard police sirens. Burrage left with her friends and began walking down South Stewart Avenue toward her friend's house on 73rd Street when a gray

Charger pulled up to her. A person she knew as "Gargamel" was driving and defendant was in the passenger seat. Defendant told her to get in the car and that they were going home. Once in the car, she saw that defendant's hand was wrapped in a white T-shirt because he was bleeding from a gunshot wound. They drove to St. Bernard's Hospital.

¶ 30   Burrage testified that, on the way to the hospital, defendant instructed her to fabricate a story to the police. Specifically, he told her to tell the police that defendant was at the bus stop on South Stewart Avenue when a white car pulled up and started shooting. At the hospital, Burrage was questioned by the police and told them that false story. She reiterated this false story at the police station. She eventually told the detectives the truth, namely, that "when the shots rang out, [she] ran in a backyard with two other girls," that defendant had not been with her at that time, and that defendant had given her the idea for the false alibi. Burrage testified that, in fact, she had not seen defendant at all during the time between their argument and defendant picking her up in the car.

¶ 31   Burrage also testified that when she had emerged from the hiding place in the backyard, she saw Dimarko Jones lying across the street at the intersection of 75th Street and South Stewart Avenue by a liquor store. She testified that he was bleeding and had been shot, but she did not know how he had been shot.

¶ 32                              7. Physical Evidence

¶ 33   Several witnesses testified regarding the physical evidence and the police investigation. The jury was told about the 13 shell casings that were recovered, the locations of the bullet holes that were found near both crime scenes, the bloodstains found at both crime scenes, the recovered T-shirt stained with blood, and the weapons involved in the shootout (three and as many as five separate firearms). The weapons were not recovered.

¶ 34   At the close of the State's case, defendant moved for a directed verdict, which the trial court denied.

¶ 35                          B. Defendant's Case-in-Chief

¶ 36   Defendant presented Dimarko Jones. He testified that he was defendant's friend and had known defendant, Shawn Bowens, Michael Watson, and Taft Wilson for about 13 years. He testified that at 12:30 a.m. on the night in question, he was at the bus stop at 75th Street and South Stewart Avenue with three females, where he had been for several hours. He testified that one of the females was named Crystal, one was named Rashon, and he did not know the third one's name. He testified that defendant was standing by the liquor store across the street.

¶ 37   Jones testified that he heard shots fired to the north from the area of 73rd Street and South Stewart Avenue, and then a white van "came flying" past the group and continued south toward 76th Street. Next, a person pulled up on a moped and shots were fired into the crowd. Jones turned to run, was shot in the back, and fell to the ground. Jones testified that, after he had been shot, defendant crossed the street toward them, telling everyone it was time to leave. He also testified that, after the shooting started, he did not see where defendant went and that defendant and the three females "ran towards the back of the house." Jones later testified that, after he had been shot, "the only person [he] saw" was a "Caucasian lady" who was holding him. Jones testified that defendant had been shot, and he believed that defendant drove himself to the hospital.

¶ 38     Jones testified that he was taken by ambulance to Christ Hospital. Jones admitted that he did not tell the police officers that night that the moped driver was the person who shot him, that instead he told the officers he did not see the shooter. He also denied being in a van with defendant shooting at a porch that night in the area of 7300 South Stewart Avenue. Jones remained in the hospital, where he was treated for his gunshot wound for two or three days.

¶ 39     The defense had subpoenaed another witness, Celia Robles, who had been served the day before, but she did not respond to her subpoena and was not present in court. The defense requested a continuance to find Robles and made an offer of proof that Robles would testify as follows: that she was on a porch at 7506 South Stewart Avenue when she heard shooting and she ran into the house; that, when she came back out, she saw a black male on a bike firing a gun, and she saw Dimarko Jones lying on the curb; and that she was interviewed by police after the incident and gave them this information.

¶ 40     The court denied the defense's request for a continuance, deciding that Robles was not a material witness. The court noted that numerous witnesses had already testified to the evidence in the proffer. The court stated that Robles's testimony would be cumulative and not material to the issue of whether defendant was the person who shot and killed Roosevelt Wilson or committed the attempted murders.

¶ 41                              C. State's Rebuttal

¶ 42     In rebuttal, the State called Chicago police officer Sanders, who spoke to Dimarko Jones at Christ Hospital while he was being treated for his gunshot wound. Officer Sanders testified that Jones did not tell him that: (1) Jones had seen the individual who shot him; (2) the individual who shot Jones was on a moped; (3) Jones was with females named Rashon and Crystal; or (4) Jones saw a white van speeding down South Stewart Avenue.

¶ 43                              D. Jury Instructions

¶ 44     For each of the three charged offenses, the State tendered corresponding firearm-enhancement instructions, which the court accepted. For the two attempted murder charges, the State alleged that defendant personally discharged a firearm, which, if proven beyond a reasonable doubt, would require a 20-year enhancement to any sentence for attempted murder he would receive. For the murder charge, the State alleged that defendant personally discharged a firearm that proximately caused Roosevelt Wilson's death, which would enhance any sentence for murder by 25 years if proven beyond a reasonable doubt. The State did not tender accountability instructions.

¶ 45                              E. Closing Arguments

¶ 46     In its closing argument, the State argued that defendant personally shot and killed Roosevelt Wilson. The State did not present an accountability theory in its closing argument. The defense did not address accountability in its closing argument.

¶ 47                              F. Jury Deliberations

¶ 48     After the jury began its deliberations, the jurors sent a series of notes to the court over the next several hours. One of the notes contained multiple questions, notably asking: (1) for clarification on the difference between the first-degree murder charge and the " 'personally

pulling trigger' allegation"; (2) "What is reasonable doubt?"; and (3) "If defendant was in van [*sic*] as part of a group who meant to kill someone, do we find him guilty?" In response to the first question requesting clarification on the difference between the first-degree murder charge and the " 'personally pulling trigger' " allegation, the court stated: "[T]he answer is contained in the instructions you just received."

¶ 49    In response to the second question–"What is reasonable doubt?"–the court stated: "[R]easonable doubt cannot be defined for you. That is for you to determine." Outside the jury's presence, the court said that it believed its response to this second question was "in keeping with case law and [the Illinois Pattern Jury Instructions]," and neither party objected.

¶ 50    In response to the third question ("If defendant was in van [*sic*] as part of a group who meant to kill someone, do we find him guilty?"), the court stated: "you must determine the facts of the case, apply the law to the facts, and in this way reach your verdicts." Remarking on this last question, the court stated that it "did not want to answer the question as if [the court were] commenting on their statement of this fact as true." The court further explained that its "interpretation of the evidence was that the allegation was the defendant was the actual shooter and not accountable." Both sides agreed that the court's response to the question was appropriate.

¶ 51    In another note, the jury asked: "Are their [*sic*] other accomplises [*sic*] from this crime that have been tried or will be tried at some time in the future?" The parties agreed to the following response from the court: "The only person you are to concern yourselves with is James Peoples."

¶ 52    The jury's final question, sent at 8 p.m., was, "Can someone be guilty of first degree murder [and] not pull the trigger? We are struggling with the concept of a guilty verdict but not having enough evidence that shows or proves James Peoples was the shooter. Your assistance is most welcome! Thanks, Jury."

¶ 53    In discussing the question outside the presence of the jury, the court asked the parties for their thoughts. Initially, the defense suggested the jurors be instructed to continue deliberating, while the State suggested they be told that they had their collective recollection of the testimony and evidence, the exhibits in front of them, and the law. The court commented that these responses did not answer the jury's question. As the court explained: "They don't have the law that answers this question. *** [Their question is] a question of law. *** They do not have this law in front of them." But defense counsel argued that "[t]hat law is not applicable." The court determined it was obligated to answer a question of law and that the jury's question was a question of law "under a theory for which the law was not provided." As the court stated: "They don't have the law about the theory of accountability." Defense counsel responded that it was "not the applicable law in this case" and noted there was no indicted count stating that defendant was "accountable for anyone else's actions." Eventually, over the defense's objection and request for a mistrial, the court responded at 8:40 p.m.: "Dear Jury, The answer is Yes. Judge Petrone." Five minutes later, at 8:45 p.m., the jury returned its verdicts.

¶ 54                                  G. The Jury's Findings
¶ 55    The jury found defendant guilty of two counts of first-degree murder and two counts of attempted first-degree murder. The jury found that defendant personally discharged a firearm during the commission of the attempted first-degree murder of both Michael Watson and Taft Wilson. However, the jury also found that the State did *not* prove the allegation that, during the

murder of Roosevelt Wilson, defendant personally discharged a firearm that proximately caused Roosevelt Wilson's death.

## H. Posttrial Motion

Defendant filed a timely posttrial motion, raising numerous issues. His memorandum of law filed in support of his motion focused solely on the trial court's response to the final question posed by the jurors during deliberations. After hearing arguments, the court denied defendant's motion.

## I. Sentence

The court sentenced defendant to 70 years of incarceration. The court merged the two murder counts and sentenced defendant to a 40-year term for murder. On each attempted murder count, the court sentenced defendant to a 30-year term, which included the 20-year mandatory firearm enhancement. The court ordered the attempted murder sentences to run concurrently with one another, but to run consecutively to the murder sentence. This appeal followed.

## II. ANALYSIS

### A. Sufficiency of the Evidence

We first address defendant's argument that the State's evidence was insufficient to prove him guilty beyond a reasonable doubt where it consisted primarily of "incredible and contradictory identification testimony" from witnesses who had a clear motive to curry favor with the State regarding their own criminal acts. He notes that the two State eyewitnesses without such a motive–Roosevelt Gray and Willie Thomas–were unable to identify anyone in the white van. Defendant also argues that there was a complete lack of physical evidence connecting him to the shooting, aside from the gunshot wound to his hand, which he claims demonstrated only that he was a victim. Defendant argues that we should reverse his convictions outright.

When a defendant challenges the sufficiency of the State's evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Baskerville*, 2012 IL 111056, ¶ 31. "This standard of review 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *People v. Brown*, 2013 IL 114196, ¶ 48 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is also in the best position to resolve any conflicting inferences produced by the evidence. *People v. Bonaparte*, 2014 IL App (1st) 112209, ¶ 41. "[T]he trier of fact is not required to disregard inferences that flow from the evidence, nor is it required to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." (Internal quotation marks omitted.) *Id.*

As a court of review, it is not our function to retry the defendant or to substitute our judgment for that of the jury. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). "A defendant's conviction will not be reversed 'simply because the evidence is contradictory [citation] or because the defendant claims that a witness was not credible.' " *People v. Alvarez*, 2012 IL

App (1st) 092119, ¶ 52 (quoting *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009)). However, although a jury's determinations of the credibility of witnesses and the weight of the evidence are entitled to deference, they are not conclusive. *People v. Brown*, 2013 IL 114196, ¶ 48. "Rather, a criminal conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id*.

¶ 65    The State's case against defendant relied on evidence that included, among other things, the gunshot wound sustained by defendant, the testimony of Burrage that defendant asked her to lie to the police regarding her knowledge of defendant's whereabouts at the time of the crime, and the testimony of three witnesses who identified defendant as the shooter. The testimony of a single credible witness may be sufficient to sustain a conviction, even if it is contradicted by the defendant. *People v. Sullivan*, 46 Ill. 2d 399, 401 (1970); *People v. Fultz*, 2012 IL App (2d) 101101, ¶ 45.

¶ 66    Defendant argues that all three of the State's identification witnesses were incredible. Taft Wilson, Michael Watson, and Shawn Bowens all testified that they saw defendant in the van and saw him shooting. These three witnesses were able to identify the occupants of the van and, in addition to defendant, identified Kevin Stanley and Robert Davis. Both Taft Wilson and Shawn Bowens also saw Dimarko Jones in the van. Defendant points to the numerous inconsistencies among the witnesses' testimony. He notes that the witnesses gave contradictory testimony regarding where each occupant was located within the van. He contrasts Michael Watson's testimony that he was in the area and that his brother Taft Wilson was present, with Taft Wilson's testimony that his brother Michael Watson was not in the area when the shooting took place. Defendant also notes the inconsistent testimony regarding whether Shawn Bowens was across the street before he sat down on the porch where the shooting took place. Defendant further argues that Bowens's identification of him was severely undermined if, "as the evidence suggests, Bowens was actually on the east side of Stewart [Avenue] when the van arrived." Defendant asserts that, if that were true, "there is no way that [Bowens] would have been able to see [the van's] occupants because the open passenger-side of the van never would have been visible to someone on the east side of Stewart [Avenue]."

¶ 67    "The mere existence of conflicting evidence at trial does not require a reviewing court to reverse a conviction." *People v. Goodar*, 243 Ill. App. 3d 353, 357 (1993). "That one witness's testimony contradicts the testimony of other prosecution witnesses does not render each witness's testimony beyond belief." *People v. McCarter*, 2011 IL App (1st) 092864, ¶ 22; see also *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). "Any discrepancies in the testimony were a question for the jury." *People v. Thomas*, 384 Ill. App. 3d 895, 899 (2008). "The trier of fact is free to accept or reject as much or as little of a witness's testimony as it pleases." *People v. McCarter*, 2011 IL App (1st) 092864, ¶ 22; see also *People v. Logan*, 352 Ill. App. 3d 73, 81 (2004). "It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *McCarter*, 2011 IL App (1st) 092864, ¶ 22; see also *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). Also, where identification testimony is positive, precise consistency as to collateral matters is not required to establish guilt beyond a reasonable doubt. *People v. Miller*, 101 Ill. App. 3d 1029, 1040 (1981); *People v. Reed*, 84 Ill. App. 3d 1030, 1036 (1980).

¶ 68    Defendant argues that the jury should not be allowed to accept beyond a reasonable doubt the witnesses' testimony that defendant was in the van, but "reject so many incredible portions

of the witnesses' testimony–how they obtained their guns, what they did with the guns afterward, whether Watson was on the scene and participated in the shootout, and whether Dimarko Jones was in the van during the shooting, to name a few."

¶ 69        In defendant's closing argument, he pointed out these inconsistencies to the jury. The jury determined that these inconsistencies were not significant enough to outweigh the accounts of defendant's involvement by these witnesses.

¶ 70        The State noted in its rebuttal that these individuals all knew each other, had grown up together, and had attended school together. Taft Wilson, Michael Watson, and Shawn Bowens all testified to the nicknames of the individuals they saw in the van and each stated that defendant's nickname is "Midget." As the State argued to the jury, this case was not about "identification" but, rather, it was about "recognition."

¶ 71        Here, three witnesses identified defendant as one of the individuals in the van. Taft Wilson testified that defendant was the person who aimed the gun at Roosevelt Wilson and him and fired three to seven shots. Michael Watson testified that defendant was shooting at his family members in front of his house. Shawn Bowens testified he saw defendant in the van moving toward the door and then heard gunshots coming from the van. The witnesses' testimony, if believed by the jury, was sufficient to establish defendant's guilt beyond a reasonable doubt. It was the jury's function to determine whether witnesses, including Taft Wilson, Michael Watson, and Shawn Bowens, were credible. As shown by the jury's verdict, and its specific finding that the State proved the allegation that defendant personally discharged a firearm during the commission of the attempted first-degree murders, the jury found these State witnesses credible. We conclude that the evidence, viewed in the light most favorable to the State, was sufficient to prove defendant guilty of the charged offenses beyond a reasonable doubt.

¶ 72                    B. Denial of Defendant's Request for Continuance

¶ 73        Defendant next argues that the trial court committed reversible error by denying defendant's request for a continuance to obtain Celia Robles's testimony. The State argues that defendant forfeited this argument by failing to raise it in a posttrial motion, and the issue could only be reviewed, if at all, under a plain-error analysis.

¶ 74        The plain-error doctrine is a limited and narrow exception to the general rule of procedural default. *People v. Walker*, 232 Ill. 2d 113, 124 (2009). The doctrine allows a reviewing court to consider unpreserved error when a clear or obvious error occurs and one of two conditions is met: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 75        Defendant first argues that we should not consider the argument forfeited, despite his failure to include the issue in a posttrial motion, because the trial court had an opportunity to consider the issue fully. In the alternative, defendant claims that we should consider it as plain error under either prong of the analysis. Because we ultimately conclude that no error occurred here, it makes no difference whether we consider the issue as preserved error or plain error. See *People v. Kitch*, 239 Ill. 2d 452, 462 (2011) (if no error occurred at all, by definition no plain error occurred).

¶ 76    After a trial has begun, the decision to grant a continuance is within the sound discretion of the trial court. *People v. Ward*, 154 Ill. 2d 272, 304 (1992). On appeal, the trial court's refusal to grant a continuance will be reversed only when it is shown that the trial court abused its discretion, and the refusal resulted in prejudice to the defendant. *Id*. "In reviewing the denial of a request for a continuance sought to secure the presence of a witness, the factors to be considered are: (1) whether defendant was diligent; (2) whether defendant has shown that the testimony was material and might have affected the jury's verdict; and (3) whether defendant was prejudiced." *Id*. at 307.

¶ 77    As noted earlier, the defense proffered that Robles would testify that she was on a porch at 7506 South Stewart Avenue when she heard shooting and ran into the house; when she came back out, she saw a black male on a bike firing, and she saw Dimarko Jones lying wounded on the curb. Defendant argues that this testimony was critical to corroborate the testimony of Dimarko Jones that he was shot while on the street at 75th Street and South Stewart Avenue, and not while riding in the white van and participating in the shootout that began in the 7300 block of South Stewart Avenue, as the State alleged. Defendant places such importance on Jones's claim of being at 75th Street and South Stewart Avenue, away from the initial barrage and the white van, because Jones is defendant's alibi–Jones testified that defendant was also at that intersection at 75th Street and South Stewart Avenue, just across the street from Jones, when the gunfire first erupted two blocks to the north.

¶ 78    In denying the continuance, the trial court first acknowledged defendant's lack of diligence in not serving Robles on an earlier date. But the court stated: "Even so, if I thought the witness was really material and critical to the prosecution, I would grant a continuance." Thus, the court based its decision primarily on the second factor enunciated in *Ward*, the materiality of the proffered testimony. See *id*.

¶ 79    In concluding that Robles was not a material witness, the court reasoned that the proffered testimony was cumulative. The court noted that the same testimony had been presented to the jury through numerous witnesses including: (1) Dimarko Jones, a defense witness; (2) Michael Watson, a friend of the decedent, Roosevelt Wilson; and (3) Willie Thomas, a neutral person. In the court's words, the proffered testimony was:

> "completely cumulative because the person who was on the bike with the gun Michael Watson himself testified he was on the bike shooting with a gun, chasing the car. A neutral person, if you will, [retired] Officer Willie Thomas testified that he was on his porch on that block looking out when he saw the shooting, and he saw a young black male on a bike chasing a white van shooting. And Dimarko Jones, the defense witness *** also testified that a person was on a bike shooting."

¶ 80    Robles's testimony was also similar to Antoinette Burrage's testimony that she was at 75th Street and South Stewart Avenue, heard gunshots, hid somewhere, and subsequently saw Jones lying on the curb with a gunshot wound. Thus, insofar as the proffered testimony would demonstrate that a man on a bike was shooting, or that Jones was lying wounded at 75th Street and South Stewart Avenue after the shooting had finally subsided, we agree with the trial court that this testimony added nothing new. In the end, there was no dispute that some gunshots were fired in the area of 75th Street and South Stewart Avenue by a person on a bike, nor was there any dispute that Jones was found wounded on a curb at 75th Street and South Stewart Avenue.

¶ 81　　Defendant claims, however, that the relevance of Robles's proffered testimony is that it would bolster Jones's testimony that Jones was positioned at 75th Street and South Stewart Avenue when the shooting began two blocks north of that location, which would likewise bolster his additional testimony that *defendant* was at the same location, just across the street, at that same time. If the jury accepted that proposition as true, then of course defendant could not have been one of the shooters in the white van speeding south toward 75th Street; he was at 75th Street all along.

¶ 82　　The problem with this argument, however, is that the proffered testimony did not go that far. Based on defense counsel's proffer, Robles's testimony was simply that she was outside on the porch before the shooting, that she ran inside her house once she heard gunfire, and that, when she emerged from her house, she saw a man on a bike firing a gun and Jones lying on the curb at 75th Street and South Stewart Avenue, bleeding. Robles's testimony, as proffered, would not place Jones at 75th Street and South Stewart Avenue at the time the shooting began up in the 7300 block. Simply put, based on the proffer, Ms. Robles would not have been able to testify how Jones ended up on that curb–whether he had been in that area all along (as he claimed) or whether he was dumped out of the white van (as the State claimed). And we are thus hard-pressed to see how this testimony would have ultimately lent any credence to Jones's additional testimony that defendant was with Jones, at 75th Street, all along as an innocent bystander.

¶ 83　　Defendant failed to show that Robles's testimony was material and might have affected the jury's verdict. We conclude that the trial court did not abuse its discretion in denying defendant's request for a continuance to obtain testimony from Celia Robles.

¶ 84　　　　　　　　　　　　C. Jury Question on Reasonable Doubt

¶ 85　　Defendant next argues that the trial court erred when it answered the jury's question–"What is reasonable doubt?"–by stating, "[R]easonable doubt cannot be defined for you. That is for you to determine." Defendant contends that the court's response was "a defective reasonable doubt instruction." Defendant concedes he forfeited this issue but now invokes the plain-error doctrine.

¶ 86　　As previously discussed, the plain-error doctrine permits review of unpreserved errors where (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Piatkowski*, 225 Ill. 2d at 565. Defendant argues that this issue can be reviewed under the first prong because the evidence was closely balanced. Defendant also asserts that this issue is reviewable as second-prong plain error. The first step of plain-error review is to determine whether any error occurred at all. *Kitch*, 239 Ill. 2d at 462; *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 87　　During the pendency of this appeal, the Illinois Supreme Court issued its opinion in *People v. Downs*, 2015 IL 117934, which resolves the issue presented here. In *Downs*, the jury sent out a note asking, " 'What is your definition of reasonable doubt, 80%, 70%, 60%?' " *Id.* ¶ 6. The trial court responded, " 'We cannot give you a definition[;] it is your duty to define.' " *Id.* ¶ 7. Our supreme court determined that there was no error in this response, which the court stated was "unquestionably correct." *Id.* ¶ 24.

¶ 88      The court in *Downs* cited with approval the opinion in *People v. Thomas*, 2014 IL App (2d) 121203. In *Thomas*, the jury's question was, "[W]hat is the legal definition of reasonable doubt?" and the trial court's response was, "It is for you to determine." (Internal quotation marks omitted.) *Downs*, 2015 IL 117934, ¶ 23. The appellate court in *Thomas* held that the response was "unquestionably correct" and that a "trial court's instruction that the meaning of reasonable doubt is for jurors to determine is a correct statement of Illinois law." (Internal quotation marks omitted.) *Id.*

¶ 89      In the instant case, the court's response, that "reasonable doubt cannot be defined for you. That is for you to determine," was substantively identical to the response approved by our supreme court in *Downs*. Based on *Downs*, we are compelled to find that the trial court committed no error. Having determined the trial court did not err in its response, there can be no plain error.

¶ 90                          D. Jury Questions on Accountability

¶ 91      We reach a different conclusion as to the court's response to the jury's final question, regarding accountability. Again, the jury's last note asked:

> "Can someone be guilty of first degree murder [and] not pull the trigger? We are struggling with the concept of a guilty verdict but not having enough evidence that shows or proves James Peoples was the shooter. Your assistance is most welcome! Thanks, Jury."

¶ 92      The trial court answered "[y]es" to this question. Whether the trial court gave the correct answer is a question of law we review *de novo*. *People v. Leach*, 2011 IL App (1st) 090339, ¶ 16.

¶ 93      When the court received this final question from the jury, defendant requested that the court instruct the jurors to continue deliberating, but the court decided it was obligated to answer this question of law. Defendant argues that the trial court committed prejudicial error because its response of "[y]es" injected a new theory of culpability–accountability–into the trial, which the State had never raised and against which defendant had no opportunity to present a defense.

¶ 94      We agree that the trial court's response was incorrect. Instead of answering yes, the court should have answered "no." Accountability was not a theory pursued at trial, and thus, as applied to the circumstances of this case, it was incorrect for the trial court to instruct the jury that it could convict on a theory of accountability. While it is ordinarily appropriate for a trial court to answer a question of law posed by the jury, "the court should not submit new charges or new theories to the jury after the jury commences its deliberations. [Citation.]" *People v. Millsap*, 189 Ill. 2d 155, 160-61 (2000).

¶ 95      In *Millsap*, the defendant was charged with robbery and home invasion. *Id.* at 159. The State charged the defendant only on a direct theory of liability. *Id.* After the jury had begun its deliberations, it asked whether the accomplice was equally guilty as an offender who actually causes the injury in a home invasion. In response, over objection, the trial court instructed the jurors on the doctrine of accountability. *Id.* at 160. Our supreme court held that the trial court committed reversible error in giving this new jury instruction, even though it correctly stated the law in the abstract, because it injected a new theory into the trial after the jury had begun deliberating. *Id.* at 165 ("It was too late for the State to change its theory of the case after the

- 14 -

case had been sent to the jury."). The instruction on accountability, given to the jury after it had begun deliberations, raised the serious possibility that the defendant was convicted on a theory that the defense never had an opportunity to contest, thereby depriving the defendant of his right to a fair trial. *Id*. at 166.

¶ 96　　Almost 10 years before *Millsap* was decided, this court had addressed a similar issue in *People v. Jamison*, 207 Ill. App. 3d 565 (1991), a case cited with approval in *Millsap*. The court in *Jamison* concluded that the trial court abused its discretion in giving the jury a supplemental instruction on accountability after the jury began deliberating because it allowed the defendant to be convicted on a theory not addressed at trial. Other decisions of this court are consistent with *Millsap*. See *People v. Laabs*, 2011 IL App (3d) 090913, ¶ 20 ("Based upon *Millsap* and *Jamison*, there can be no dispute in the present case, and indeed there is no dispute, that the trial court erred in instructing the jury on a new theory of guilt, accountability, during deliberations, in response to the jury's question."); *People v. Wilson*, 312 Ill. App. 3d 276, 287 (2000) ("because the defense never had the opportunity to argue accountability as it pertained to the murder charge and because the jurors' query after 10 hours of deliberation implied that they had not yet reached a verdict on the murder charge and had some concerns as to whether defendant was the shooter, the trial court abused its discretion in submitting an instruction that presented a new theory").

¶ 97　　There is no question that the trial court committed reversible error in instructing the jury that it could convict based on a theory of accountability. Nor, under the circumstances, do we find this error harmless beyond a reasonable doubt. There is, at a minimum, a serious risk that defendant was convicted of murder based on a theory never presented to the jury, and which defendant never had the opportunity to contest. The State did not prosecute defendant as an accomplice. It only prosecuted him as the principal shooter. Neither the State nor defendant ever addressed accountability in closing arguments. The theory never came up until the jury started asking questions about that theory. The jury, at various times during deliberations, sent out notes seeking "clarification" on the difference between the first-degree murder charge and the allegation that defendant had "personally" discharged a firearm that proximately caused death to Roosevelt Wilson (the 25-year enhancement instruction accompanying the murder charge), and had also asked whether they should find defendant guilty if he was in the van as part of a group who meant to kill someone. Most notable was the last question, in response to which the court instructed the jury that it could, in fact, convict defendant of murder based on accountability.

¶ 98　　Equally notable is the jury's special verdict on the firearm enhancement accompanying the murder charge–asking whether the State proved beyond a reasonable doubt that defendant personally discharged a firearm that proximately caused death–in which the jury found that defendant did *not* shoot the bullet that killed the victim, or at least that the State did not prove this fact beyond a reasonable doubt. Because of the serious possibility that the jury convicted defendant of murder not because it found him to be the principal shooter as charged by the State but, rather, because the trial court erroneously told the jury that it could convict him based on accountability, a theory defendant never had the opportunity to address at trial or during closing arguments, we do not find this error harmless beyond a reasonable doubt. See *Millsap*, 189 Ill. 2d at 166 (because defendant might have been convicted on theory that defendant had no opportunity to address in closing argument, error was not harmless).

¶ 99     We must next determine whether this error requires outright reversal or remand for a new trial. We would reverse outright if we found that a retrial would violate double jeopardy principles (see U.S. Const., amend. V; Ill. Const. 1970, art. I, § 10), which would occur in this instance only if defendant were retried for an offense for which he had been previously acquitted. *People v. Howard*, 2014 IL App (1st) 122958, ¶ 13.

¶ 100    Defendant argues that this is precisely such an instance, because in effect he was acquitted of first-degree murder, based on the jury's special finding regarding the 25-year firearm enhancement. In other words, because the jury found that the State failed to prove beyond a reasonable doubt that he personally discharged the weapon that resulted in Roosevelt Wilson's death, the jury did not prove defendant guilty as the principal shooter. Defendant claims that, "if the trial court had not erroneously injected the issue of accountability into the trial, [he] would have been acquitted." The State, on the other hand, finds no inconsistency between the guilty verdict on the murder charge and the "acquittal" on the special enhancement verdict form, because it claims that the verdicts required different proof. Thus, the State claims, there is no bar to retrial of this matter for first-degree murder.

¶ 101    There is no question that the two verdicts are in conflict. Defendant was convicted on two counts of murder (which were merged into one, because only individual died). One of them required that the State prove that defendant, "in performing the acts which cause the death[,] *** either intends to kill *** or knows that such acts will cause death to that individual." 720 ILCS 5/9-1(a)(1) (West 2006). The other required that the State prove that defendant, "in performing the acts which cause death[,] *** knows that such acts create a strong probability of death *** to that individual." 720 ILCS 5/9-1(a)(2) (West 2006). Compare that language to the special jury verdict form for the firearm enhancement, which required that the State prove that defendant, "during the commission of the offense *** personally discharged a firearm that proximately caused *** death" to Roosevelt Wilson. 730 ILCS 5/5-8-1(d)(iii) (West 2006).

¶ 102    We see no meaningful difference in the language constituting the offense of first-degree murder and the enhancement language. It is undisputed that the "act" that allegedly "cause[d] death" in this case was the discharge of a bullet that killed Roosevelt Wilson. It is impossible to reconcile the jury's finding that defendant "perform[ed] the acts which cause[d] death" to Roosevelt Wilson with its finding that defendant did *not* "personally discharge[ ] a firearm that proximately caused [the] death" of Roosevelt Wilson. The jury found, in effect, both that defendant killed Roosevelt Wilson with a bullet from his gun, and that defendant did not kill Roosevelt Wilson. These two verdicts are diametrically opposed to one another. See *People v. Reed*, 396 Ill. App. 3d 636, 647 (2009) (guilty verdict on first-degree murder and acquittal on firearm enhancement were irreconcilable).

¶ 103    But it does not follow that we should find that defendant was not proven guilty of first-degree murder beyond a reasonable doubt and reverse that conviction outright. Inconsistent verdicts–where a defendant is convicted of one crime and acquitted of another involving the same elements–do not mandate outright reversal of the conviction. See *id.* at 646-47 (despite inconsistency between first-degree murder conviction and acquittal on firearm enhancement, outright reversal of murder conviction not required). This has been the law in Illinois since 2003, when our supreme court reversed its previous rule and aligned itself with the reasoning in *United States v. Powell*, 469 U.S. 57 (1984), holding that "defendants in Illinois can no longer challenge convictions on the sole basis that they are legally inconsistent with acquittals on other charges." *People v. Jones*, 207 Ill. 2d 122, 133-34 (2003); see also

*Reed*, 396 Ill. App. 3d at 646-47 (relying on *Jones* for this proposition). There are many reasons for this rule, including that in the face of competing verdicts–one guilty, one not guilty–a reviewing court cannot know which of those verdicts reflected the jury's true intent and which did not; " 'it is unclear whose ox has been gored.' " *Jones*, 207 Ill. 2d at 130 (quoting *Powell*, 469 U.S. at 65). Second, even though the inconsistency could injure the State as much as the defendant, the State could not appeal an acquittal, while the defendant could appeal a conviction. *Id*. at 130-31. Third, an inconsistent verdict could be nothing more than a product of jury lenity, lacking any factual integrity. *Id*. at 130. And finally, a defendant could still challenge the sufficiency of the evidence, lending a check on jury irrationality. *Id*. at 131.

¶ 104    Defendant acknowledges the holding in *Jones* and likewise concedes that *Reed* applied *Jones* to a situation very similar to the one at hand, namely, a conviction for first-degree murder but an acquittal on a firearm enhancement related to that murder. See *Reed*, 396 Ill. App. 3d at 646. The difference, defendant claims, is that in this case, unlike in *Reed*, the murder conviction was tainted by the erroneous answer to the jury question injecting accountability into the trial. Thus, defendant argues that, unlike in *Reed*, where the challenge to the jury verdict on murder was simply based on its inconsistency with the special finding on the gun enhancement, in this case the jury never "properly" convicted defendant of murder, and its only "proper" verdict on this score was its acquittal on the firearm enhancement related to that murder.

¶ 105    Defendant is correct that the circumstances of this case are more favorable to him. In *Reed*, there was no argument that the trial court gave an erroneous answer to a jury question that likely caused the jury to misunderstand the law and convict the defendant of murder. And the facts of this case strongly suggest that the jury believed that defendant was not proven to be the principal shooter. After all, the final jury note said as much ("We are struggling with the concept of a guilty verdict but not having enough evidence that shows or proves [defendant] was the shooter."). And when the trial court incorrectly told the jury that it could convict based on an accountability theory, the jury returned its guilty verdict in no more than *five minutes*. It requires no leap of the imagination to speculate that the jury believed that defendant was present at the crime scene and acting in concert with others (and that defendant fired a weapon and attempted to kill two individuals), but the jury did *not* believe that the State proved that a bullet from defendant's gun killed Roosevelt Wilson.

¶ 106    But however likely that possibility might be, it is speculation all the same. We may not guess as to why a jury did what it did, no matter how obvious it may seem to us. See *People v. Spears*, 112 Ill. 2d 396, 409 (1986) ("Simply put, courts are not in the business of second-guessing a jury's 'clear intent.' *** [N]or will this court attempt to metaphysically divine a jury's collective intent from a single question that may well have only embodied the curiosity or concern of a single juror."). The simple fact is that we cannot altogether rule out the possibility of jury lenity or compromise, or the remote chance that the jury's error favored the State and not the defendant.

¶ 107    Because we cannot say, as a matter of law, that the jury intended to acquit defendant of first-degree murder, and because we found earlier that there was sufficient evidence to convict defendant of first-degree murder, the proper course of action is to reverse defendant's conviction and remand for a new trial. *People v. Ward*, 2011 IL 108690, ¶ 50.

¶ 108                    E. Whether Defendant's Sentence Was Excessive

¶ 109    Defendant next argues that his 70-year aggregate sentence is excessive. Defendant received 40 years for first-degree murder, and he was sentenced to 30 years for each of his two convictions for attempted first-degree murder. The two 30-year sentences ran concurrently to one another but consecutively to the 40-year sentence, for a total of 70 years. Of course, with our reversal of the murder conviction, only the 30-year sentences remain for consideration. That probably takes some of the wind out of defendant's argument, because it was with the 40-year murder sentence that the trial court deviated upward from the minimum rather significantly.

¶ 110    Regardless, because defendant raised it, and because this may be his only opportunity to challenge the 30-year sentences on a direct appeal, we will review the 30-year sentences for excessiveness. If defendant is convicted of first-degree murder on retrial, he will not be foreclosed from arguing about the excessiveness of whatever sentence he may receive for that offense, nor will he be prevented from challenging any sentences he received for all of these convictions in the aggregate.

¶ 111    A reviewing court may not alter a defendant's sentence absent an abuse of discretion by the trial court. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Where a sentence imposed is within the statutory range, this court will not find an abuse of discretion unless the sentence is "greatly at variance with the purpose and spirit of the law." (Internal quotation marks omitted.) *People v. Sharp*, 2015 IL App (1st) 130438, ¶ 134 (quoting *People v. Center*, 198 Ill. App. 3d 1025, 1032 (1990)). We defer to the trial court's judgment on sentencing because the lower court, " 'having observed the defendant and the proceedings, has a far better opportunity to consider [sentencing] factors than the reviewing court, which must rely on the "cold" record.' " *Alexander*, 239 Ill. 2d at 212-13 (quoting *People v. Fern*, 189 Ill. 2d 48, 53 (1999)). The trial court is in a superior position to weigh the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). The trial court is thus far better suited to balance the need to protect society against the rehabilitative potential of the defendant. *Sharp*, 2015 IL App (1st) 130438, ¶ 133.

¶ 112    We will not reweigh the factors considered by the trial court, even if we would have balanced them differently. *Stacey*, 193 Ill. 2d at 209. Nor will we find that a minimum sentence is necessarily warranted simply due to the presence of some mitigating factors. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010); *People v. Payne*, 294 Ill. App. 3d 254, 260 (1998).

¶ 113    When mitigating factors are presented to the court, there is a presumption that the trial court considered them in determining the sentence. *People v. Burton*, 184 Ill. 2d 1, 34 (1998); *People v. Payne*, 294 Ill. App. 3d 254, 260 (1998). This presumption can be overcome only with explicit evidence from record that mitigating factors were not considered by trial court. *Flores*, 404 Ill. App. 3d at 158.

¶ 114    Defendant's sentences for attempted murder were well within the statutory guidelines. Attempted first-degree murder is sentenced as a Class X felony. See 720 ILCS 5/8-4(c)(1) (West 2006). The sentence for a Class X felony is 6 to 30 years in prison. See 730 ILCS 5/5-4.5-25(a) (West 2010). On each of the two counts of attempted murder of which defendant was convicted, defendant received 10 years, clearly at the low end of the range. The court was required to add an additional 20 years to each sentence because defendant personally discharged a firearm during the commission of these crimes. See 720 ILCS 5/8-4(c)(1)(C) (West 2006). Because the trial court had no choice but to impose the mandatory 20-year

enhancement (*People v. White*, 2011 IL 109616, ¶¶ 19-20), the only portion of the sentence that defendant is able to challenge for an abuse of discretion is the court's imposition of the 10 years, instead of the minimum 6 years.

¶ 115     Defendant contends that his sentence is excessive in light of his: (1) youth–he was 19 years old at the time of the offense; (2) lack of any criminal history–he has no prior convictions or delinquency adjudications; and (3) his rehabilitative potential–based on his strong support network of friends and family and as evidenced by his obtaining his GED and tutoring others during his pretrial incarceration.

¶ 116     During sentencing, the court heard and considered arguments in aggravation and mitigation. The factors that defendant describes on appeal were presented to the trial court in mitigation of defendant's sentence. Defense counsel told the court that defendant was 24 years old at the time of sentencing and had no juvenile background or adult convictions. Defense counsel also stated that defendant was the father of two young sons, was working odd jobs at the time he was arrested, was no longer a gang member, had attained his GED while in jail, and had also been tutoring others in jail.

¶ 117     In imposing defendant's sentence, the court expressly addressed all of these factors, with the exception of defendant's age. The court also referred to section 5-5-3.1(a) of the Unified Code of Corrections (730 ILCS 5/5-5-3.1(a) (West 2006)), which lists statutory factors in mitigation for a court to consider when imposing a sentence of imprisonment. The court stated that it agreed with defense counsel that subsection 7 applied. See 730 ILCS 5/5-5-3.1(a)(7) (West 2006) ("defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present crime"). The court noted defendant had no prior convictions and had "led a law abiding life for a substantial period of time before the commission of the present crime." Although the court did not expressly mention defendant's age, we presume that the court considered all of the mitigating factors that were presented by defense counsel. *Burton*, 184 Ill. 2d at 34; *Flores*, 404 Ill. App. 3d at 158.

¶ 118     We find no abuse of discretion. The sentences were only slightly above the minimum defendant could have received, and the court properly considered the relevant factors. We affirm defendant's sentence for attempted murder.

¶ 119                                          F. Mittimus

¶ 120     Defendant next argues, and the State concedes, that his mittimus must be corrected to reflect an additional 187 days spent in presentence custody for a total of 1,722 days (instead of 1,535 days), and the fines, fees, and costs order should reflect an outstanding balance of $530. The State agrees that defendant is entitled to $5 for each day he spent in custody prior to sentencing, resulting in a credit of $8,610 against all eligible assessments, including the $5,000 felony offense fine. Defendant does not dispute that the $8,610 credit offsets his entire $5,000 felony offense fine, nor does he dispute the State's contention that his outstanding balance should be $530 for the fees that cannot be offset. Defendant also agrees with the State that we need not address his argument regarding the correctness of the imposition of the $5,000 felony offense fine.

¶ 121     This court has the authority, pursuant to Illinois Supreme Court Rule 615(b) to order the clerk to correct the mittimus without remanding the matter to the trial court. See, *e.g.*, *People v. Flores*, 381 Ill. App. 3d 782, 789 (2008). Accordingly, we direct the clerk of the circuit court to

correct the mittimus to reflect 187 days of presentence custody credit, and the fines, fees, and costs order to reflect an outstanding balance of $530.

¶ 122                                 III. CONCLUSION

¶ 123        For the reasons stated, we conclude that the evidence, viewed in the light most favorable to the State, was sufficient to prove defendant guilty of the charged offenses beyond a reasonable doubt. We affirm defendant's conviction for attempted murder. We reverse defendant's conviction for first-degree murder and remand for a new trial. We order the clerk of the circuit court to correct the mittimus and the fines and fees order in accordance with this order.

¶ 124        Affirmed in part; reversed in part; mittimus corrected; and cause remanded with directions.