2021 IL App (1st) 191243-U
No. 1-19-1243
Order filed June 28, 2021

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 18 CR 11708 |
| ERNEST RICKS, | ) ) | Honorable Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Walker and Justice Coghlan concurred in the judgment.

¶ 1    *Held*:  We affirm Ricks's conviction and 9½-year sentence for delivery of a controlled substance.

¶ 2    A jury convicted Ernest Ricks of delivery of a controlled substance and the trial court sentenced him to a Class X term of 9½ years in prison. On appeal, Ricks contends he was not proven guilty beyond a reasonable doubt when the evidence at trial was vague, conflicting, and insufficient to support a conviction. He further contends that his sentence is excessive in light of the nature of the offense and the evidence in mitigation.

¶ 3    On this record, we hold that the jury could reasonably accept the testimony on identification of Ricks as true beyond a reasonable doubt and affirm his conviction. As to the length of the sentence, the trial court's sentence of more than statutory minimum of six years in prison is not manifestly disproportionate to the nature of the offense. We affirm.

¶ 4                                         Background

¶ 5    Chicago police officer Lisa Hampton testified that at 11:53 a.m. on May 24, 2018, she was working as an undercover buy officer in the 3100 block of West Washington Boulevard. Officer Leon Payne was the surveillance officer. Hampton parked and then walked up to a man and asked if he knew where she could get "some soft." He directed Hampton to a man in a white t-shirt and jean shorts across the street. Hampton identified Ricks in court as this person. She approached Ricks and asked the same question. Ricks replied, "Do you mean D," and Hampton responded in the affirmative. Hampton explained that "soft" and "D" are street terms for heroin. Ricks instructed her to walk through a vacant lot and into an alley.

¶ 6    Once in the alley, Hampton observed Ricks come from "behind the building." She said that Ricks then picked something up, entered the alley, put something on a garbage can, and walked toward her. Ricks extended his hand, and Hampton gave him $20 in "pre-recorded 1505 funds." Hampton went to the garbage can, retrieved two pieces of tinfoil, placed them in her pocket, and left the alley. Hampton had seen narcotics packaged for sale in tinfoil. From the time she first spoke to Ricks until she retrieved the suspect narcotics and walked away, one to two minutes elapsed. She went to her car and drove "a block or so" where officers had detained Ricks and identified him.

¶ 7    During cross-examination, Hampton testified that she had participated as the buyer in 60 to 75 undercover buys. No video of the encounter exists because that would have "hinder[ed]" her

safety. Hampton had never participated in an undercover operation while wearing a recording device. When Hampton identified Ricks shortly after the encounter, he was detained but not in custody. Officers found neither narcotics nor the pre-recorded funds on Ricks.

¶ 8    During redirect examination, Hampton said that officers delayed arresting Ricks because this incident involved a larger mission, and they wanted to avoid tipping off others.

¶ 9    Payne testified that he had participated in over 100 narcotics investigations. As the surveillance officer, he took notes on the events and ensured the buy-officer's safety. Around midday on May 24, he watched Hampton from a parked unmarked car across the street. She spoke to a man who pointed her toward another man who was "lean[ed] over into a car." Payne identified Ricks in court as the second man. Hampton approached Ricks, spoke to him, and went to the rear of a building. Ricks also walked to the rear of the building and put an item on a garbage can. Hampton handed Ricks something, retrieved what Ricks put on the garbage can, and walked away. Payne watched Ricks for another 20 to 30 minutes. As Ricks was detained, Payne did a "ride by" and identified Ricks. The identification occurred 80 to 90 yards from where Payne conducted surveillance.

¶ 10    During cross-examination, Payne testified that Ricks had on blue shorts, a white t-shirt, a white baseball cap, and green shoes. He could not see what Ricks placed on the garbage can, only its small size. Payne was about 12 feet from Hampton and Ricks as they spoke in the street and 30 to 40 feet away when they were in the alley. After 20 to 30 minutes, Ricks left the area, and Payne lost sight of him. Payne did not see the moment officers detained Ricks. He acknowledged stating in a report that Ricks was wearing black shorts, a black and white baseball cap, and green shoes.

¶ 11 During redirect examination, Payne explained that videotaping "drug deals" would jeopardize investigations and officer safety. During recross examination, Payne acknowledged police sometimes film narcotics investigations.

¶ 12 Chicago police officer Agustin Rodriguez testified that he served as the enforcement officer. Rodriguez was in an unmarked car and wore a vest, star, and firearm. Around 12:20 p.m., he received a radio communication and stopped Ricks to "ID him." Rodriguez told Ricks to dismount his bicycle, patted Ricks down, and asked for identification. Ricks provided a state-issued identification card. The stop lasted 10 minutes. Ricks was arrested July 18, 2018.

¶ 13 During cross-examination, Rodriguez acknowledged that on May 24, Rodriquez recovered neither narcotics nor pre-recorded funds from Ricks, who complied with Rodriguez's orders.

¶ 14 Forensic scientist Melissa McCann testified that the contents of one of the recovered foil packets weighed 0.443 grams and tested positive for heroin.

¶ 15 In closing argument, trial counsel noted "radical contradictions" in the officers' testimony. For example, Hampton described a person wearing jean shorts and a white top but did not mention a bicycle, hat, or green shoes. Payne testified that Ricks wore a white hat, white shirt, green shoes, and jean shorts, but his report stated Ricks wore black shorts and a white and black hat. Additionally, when identified 30 minutes later at a different location, Ricks was not arrested. Finally, Rodriguez, who did not describe the person he stopped, was the only officer to mention a bicycle. Counsel also noted that Rodriguez did not recover narcotics or "marked money."

¶ 16 The State responded that a difference existed between description and recognition and all three witnesses identified Ricks in court, although they described his outfit differently. The State noted that Hampton was "up close" to Ricks and identified him that day. Payne also identified Ricks, whom he observed for 20 to 30 minutes. That Payne thought Ricks was wearing black shorts

rather than blue did not "make a difference" to the ultimate identification because the witnesses recognized Ricks' face. The State argued that the officers waited to arrest Ricks because they were engaged in surveillance during a month-long investigation. Furthermore, it would have been suspicious if the officers took the $20 in pre-recorded funds from Ricks without an explanation. The State concluded that the minor discrepancy on the color of Ricks' shorts did not rise to the level of reasonable doubt.

¶ 17    The jury was instructed and retired to deliberate. During deliberations, the jury sent a note with two questions: "Why was [Ricks] stopped the second time when he was on the bike," and "What was the justification for the stop." The parties and the court agreed to tell the jury that it "heard all the evidence," had the instructions, and to continue to deliberate. The jury then sent a second note asking what would happen if "we can't all come to an agreement." The court and the parties discussed a response, noted that only 90 minutes had passed, and agreed to tell the jury to "please continue to deliberate." The jury found Ricks guilty of delivery of a controlled substance. The court ordered a presentence investigation (PSI) report.

¶ 18    Ricks filed a motion for a new trial arguing, in part, that the officers gave inconsistent descriptions of him. The trial court denied the motion, noting that two officers identified Ricks as the offender.

¶ 19    The PSI stated that Ricks was diagnosed with a behavioral and learning disorder in elementary school, obtained a GED in prison, had been employed as a janitor, and fathered four living children. Ricks had received treatment for heroin addiction. He incurred four convictions for possession of a controlled substance and convictions for burglary and battery.

¶ 20    In aggravation, the State noted that Ricks received Rehabilitation Alternative Probation (RAP) on October 19, 2016, for possession of a controlled substance and was then arrested on

March 16, 2018, and again, on July 18, 2018, in this case. Due to Ricks' criminal background, he was eligible to be sentenced as a Class X offender.

¶ 21    The State made an offer of proof as to the March 16, 2018 arrest. Two officers saw Ricks engage in a hand-to-hand transaction, walk away, and place something under a white van. Once Ricks was detained, police recovered a plastic baggie containing 42 smaller bags full of white power from underneath the van. Ricks was arrested and charged with possession with intent to deliver 16.1 grams of heroin based on the weight of 36 of those items. The other six items, weighing 2.6 grams, were not tested.

¶ 22    The defense argued that Ricks had been to prison once, began using heroin at age 15, and had a substance abuse problem that "interfered" with his ability to work. Ricks had learning disabilities but had obtained a GED. In allocution, Ricks professed his innocence and thanked the court for the RAP program.

¶ 23    In sentencing Ricks, the court considered that Ricks had struggled with a drug problem and previously "pled" into the court's drug program. Specifically, on October 19, 2016, the court placed Ricks on probation for possession of a controlled substance, although he was already on parole. In that matter, Ricks has been charged with a Class X offense, but the State was "empathic" enough to reduce the charges so that Ricks was eligible for probation, and the court received "parole clearance" to order probation.

¶ 24    When discussing Ricks' criminal background, the court noted his narcotics convictions but explicitly disregarded a misdemeanor battery conviction. The trial court understood that Ricks struggled due to addiction but found the "real problem" to be that he did not commit himself to the RAP program. Ricks was discharged for non-attendance and disrespected court staff. He also was "dealing on the street." The court did not believe the minimum sentence to be appropriate because,

based on the court's observations, Ricks was not ready for rehabilitation. The court considered the factors in aggravation and mitigation, including Ricks' upbringing, history, and family, and sentenced him to a Class X term of 9½ years in prison.

¶ 25    Rick's counsel made an oral motion to reconsider the sentence. The court denied the motion, stating it had considered all matters in aggravation and mitigation, as well as Ricks' rehabilitative potential and "defendant does not appear to be concerned with rehabilitation." The court also noted that despite its efforts to "get [Ricks] working," Ricks was not "interested."

¶ 26                                    Analysis

¶ 27    Ricks first contends that he was not proven guilty beyond a reasonable doubt when the identification testimony at trial was vague, conflicting, and insufficient. As further evidence of misidentification, Ricks argues that he was not arrested but detained after the alleged transaction, and police found no narcotics on him.

¶ 28                          *Sufficiency of the Evidence*

¶ 29    When reviewing a challenge to the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact resolves conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts presented at trial. *Id.* "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *Id*. A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 30     The statute concerning the offense of delivery of a controlled substance provides that "it is unlawful for any person knowingly to *** deliver *** a controlled substance." 720 ILCS 570/401 (West 2018). The State must prove the identity of the offender beyond a reasonable doubt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). A single witness's testimony can suffice to convict if the testimony is positive and credible. *People v. Gray*, 2017 IL 120958, ¶ 36. Contradictory testimony or minor or collateral discrepancies in testimony do not render the totality of a witness's testimony incredible. *Id.* ¶ 47. "Minor discrepancies in testimony affect only its weight and will not render it unworthy of belief." *Id.*; see also *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67 (discrepancies in witness testimony issue for trier of fact, which may accept or reject as much or as little of witness's testimony as it likes). On appeal, this court must determine if, "in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt." *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004). We do not, however, retry a defendant. *Id*. at 279-80.

¶ 31     Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Ricks delivered heroin to Hampton.

¶ 32      Hampton identified Ricks at trial. Payne testified that Ricks was the person to whom Hampton spoke, and Ricks had put something on a garbage can before walking away. Moreover, both Hampton and Payne identified Ricks on the same day as the person who engaged in the transaction, and the item recovered tested positive for heroin.

¶ 33     While an officer only detained Ricks on the day of the offense and no pre-recorded funds were recovered, police testified to an ongoing investigation which an arrest would have exposed to other offenders. Additionally, "there is no requirement that pre-recorded or marked funds used in a narcotics transaction be recovered for a conviction [for delivery of a controlled substance] to stand." *People v. Trotter*, 293 Ill. App. 3d 617, 619 (1997); see also *People v. Brown*, 388 Ill. App.

3d 104, 108-09 (2009) (affirming conviction for delivery of controlled substance where pre-recorded funds not recovered, as jury "weigh[s] the testimony, which was corroborated in many respects, and determine[s] its effect" on officer's credibility). Although Ricks also challenges the sufficiency of the evidence based on a lack of video recording, Hampton and Payne claimed recording presented an officer-safety issue. Given this evidence, a rational trier of fact could have found Ricks delivered a controlled substance to Hampton. *McLaurin*, 2020 IL 124563, ¶ 22.

¶ 34     Ricks nonetheless contends that the officers' identification testimony was vague, generic, and conflicting, noting that testimony differed as to the color of his shorts and hat. In support of his claim that the officers failed to "carefully collect evidence," that is, did not provide detailed, consistent identification testimony, defendant relies on a Chicago Police Department webpage titled "How to Describe a Suspect." We take judicial notice of this webpage. *E.g. Kopnick v. JL Woode Management Company, LLC*, 2017 IL App (1st) 152054, ¶ 26 ("Information on the municipality's [Chicago] public website is subject to judicial notice."). But the webpage does not help Ricks's position. Importantly, the "How to Describe a Suspect" webpage does not memorialize the Department's formal instructions to its officers; instead, it is no more than a guide on identifying suspects for residents of the City of Chicago who may become crime victims. Relevant here, the webpage also contains the following disclaimer: "You will never be able to remember all of these details about any one suspect you may see." Even if this were a directive to officers, it assumes imperfect memory of multiple details and recognizes the fallibility of human cognition and memory.

¶ 35     When assessing identification testimony, we rely on the factors in *Neil v. Biggers*, 409 U.S. 188 (1972). "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness'

degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199-200. An eyewitness's testimony fails "only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 279-80.

¶ 36    When considering the *Biggers* factors to Hampton's and Payne's identifications of Ricks as the individual who engaged in a narcotics transaction with Hampton, we conclude that these factors weigh in the State's favor.

¶ 37    First, the record demonstrates that both witnesses had the opportunity to view Ricks. Hampton testified that during a one to two minute encounter, she spoke to Ricks, met him in an alley, and handed him currency. Payne testified that he observed the events and ensured Hampton's safety as the surveillance officer. He watched as Hampton spoke to Ricks, met Ricks in the rear of a building, handed Ricks something, and took the item Ricks placed on a garbage can. Payne was 12 feet away while Hampton and Ricks spoke, and nothing obstructed his view. Thus, the first *Biggers* factor weighs in favor of the witnesses' identification of Ricks.

¶ 38    The second factor, the degree of attention of the witnesses, also weighs in favor of reliable identification. Hampton spoke to Ricks and was close enough to place something in his hand. Payne testified that he saw Hampton and Ricks from across the street and observed Ricks for 20-30 minutes after Hampton left. Nothing in the record indicates the officers were distracted or had their attention drawn elsewhere while they interacted with Ricks.

¶ 39    The third factor, the accuracy of a witness's prior description of the offender, is inapplicable as the record does not contain the description relayed to Rodriguez, which resulted in Ricks' detention. To the extent that Ricks argues the discrepancies in the previous descriptions of

his outfit are fatal to the State's case, we disagree. The color of Ricks' shorts and whether he was wearing a hat did not automatically render the entirety of Hampton's or Payne's testimony incredible. See *Gray*, 2017 IL 120958, ¶ 36 ("conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible"). Instead, these discrepancies presented an issue for the trier of fact. *Peoples*, 2015 IL App (1st) 121717, ¶ 67 (that one witness's testimony contradicts another's does not render each person's testimony beyond belief). Moreover, "a witness'[s] positive identification can be sufficient even though the witness gives only a general description based on the total impression the accused's appearance made." *Slim*, 127 Ill. 2d at 309.

¶ 40    Finally, of the last two *Biggers* factors, the length of time between the crime and the identification confrontation, further support reliability. Both Hampton and Payne identified Ricks about 30 minutes after the alleged narcotics transaction. This court has found significantly greater lengths of time have not rendered identifications unreliable. See *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (16-month delay between crime and positive identification). Neither witness testified to their degree of certainty about their identifications so that factor does not apply.

¶ 41    Considering all the evidence in a light most favorable to the State, we cannot say that either Hampton's or Payne's identification of Ricks was so unreliable to raise a reasonable doubt as to guilt. *McLaurin*, 2020 IL 124563, ¶ 22. Accordingly, we affirm.

¶ 42                                                        *Sentence*

¶ 43    Ricks next contends that his 9½ year sentence is excessive in light of the nonviolent nature of the offense and the evidence in mitigation, including his drug addiction. Due to his criminal background, Ricks was subject to a Class X sentence of 6 to 30 years in prison. See 730 ILCS 5/5-4.5-95(b) (West 2018); 730 ILCS 5/5-4.5-25(a) (West 2018)).

¶ 44    When determining a sentence, "the trial court has broad discretionary powers." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). We give substantial deference to the trial court because "the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. A reviewing court, however, may alter a defendant's sentence where it amounts to an abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A trial court abuses its discretion when crafting a sentence that varies with the spirit and purpose of the law or appears manifestly disproportionate to the nature of the offense. *Id.*

¶ 45    Absent some indication to the contrary, other than the sentence itself, a reviewing court presumes the trial court considered all mitigating evidence presented. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. A defendant's rehabilitative potential is not entitled to greater weight than the seriousness of the offense. *People v. Reed*, 2018 IL App (1st) 160609, ¶ 62.

¶ 46    Ricks argues that the nature of the offense and the mitigating circumstances combine to make his sentence excessive. Ricks maintains he harmed himself by selling heroin to an undercover officer, and that more than the statutory minimum of six years in prison was manifestly disproportionate to the nature of the offense.

¶ 47    The record shows that the trial court considered the evidence in aggravation and mitigation, including the PSI, Ricks' upbringing and criminal background, and counsel's arguments at sentencing. Although Ricks contends that the sentencing court failed to adequately consider his drug addiction and "exhibited a policy" against individuals who fail the RAP program, substance abuse issues are not inherently mitigating. See *People v. Brunner*, 2012 IL App (4th) 100708, ¶ 64 (noting, "an abusive childhood, mental-health problems, and substance-abuse issues are not set

forth in the list of mitigating factors in section 5-5-3.1(a)" of the Unified Code of Corrections).

Moreover, the trial court acknowledged that Ricks struggled with a drug problem but did not commit himself to the RAP program, was on probation when arrested in this case, and did not appear ready for rehabilitation. The court rejected the minimum sentence of 6 years as inappropriate, and sentenced Ricks to 9½ years in prison.

¶ 48    Ricks cites a law review article for the proposition that his failure to adhere to the drug program shows no more than an "inability to beat his addiction." Lynne M. Brennan, *Drug Courts: A New Beginning for Non-Violent Drug Addicted Offenders—an End to Cruel and Unusual Punishment*, 22 Hamline L. Rev. 355 (1998). Throughout the article, however, the author limits her critique of criminal punishment for the status of drug addiction to "the acts of purchasing, possessing and using drugs." *Id.* at 385-86. Though Ricks's trial counsel explained that he sold drugs, at least in part, to assuage his own addiction, it was not unreasonable for the trial court to conclude that Ricks's continued sale of drugs while on probation for another drug offense required deviation from the minimum sentence. *Cf. People v. Manuel*, 294 Ill. App. 3d 113, 127 (1997) (approving trial court's conclusion that "the sale of drugs causes harm to everyone in the chain of purchase").

¶ 49    We cannot reweigh the factors differently. See *People v. Fern*, 189 Ill. 2d 48, 53 (1999) ("In considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently."). But we can determine that his sentence is disproportionate to the nature of the offense. For this proposition, Ricks relies on *People v. Busse*, 2016 IL App (1st) 142941, in which this court reduced the defendant's sentence as disproportionate to the nature of the offense.

¶ 50    Ricks's reliance on *Busse* is not persuasive. True, as in *Busse*, Ricks's conviction would otherwise not be a Class X felony absent his criminal record, his criminal record consists of nonviolent offenses, and the nature of Ricks's crime neither involved threats nor caused physical harm. But the very nature of the offense in *Busse*—stealing quarters from a vending machine— differs entirely from selling narcotics on the street. And, under the circumstances, it was not an abuse of discretion for the trial court to see it that way.

¶ 51    Though we affirm Ricks's sentence as consistent with the trial court's discretion, we pause to reflect on one of the trial court's comments when issuing the sentence. The court said, "while some appellate court justice may criticize my decision here with regard to the sentence by not giving you the minimum *** I do not believe that you are ready for rehabilitation." We remind the trial court that even if we had reversed its sentencing judgment, it would not have been an act of criticism. Appellate courts have a duty to modify sentences incompatible with "the seriousness of the offense and with the objective of returning the offender to useful citizenship." *People v. Allen*, 2017 IL App (1st) 151540, ¶ 15; Ill. Const. 1970, Art. 1, § 11. Appellate panels should not shy away from discharging this duty whenever a criminal defendant raises an issue with the length of his or her sentence. Why? Because this duty furthers the legitimacy and consistency of the sentencing process. A reversal in the sentencing context—or any other context, really—is no more than one piece of a vital conversation between parties, lawyers, judges, and, most significantly, the public, ensuring the integrity and fairness of our criminal legal system.

¶ 52    Affirmed.