2025 IL App (1st) 220709-U

FIRST DISTRICT,
SIXTH DIVISION
February 21, 2025

No. 1-22-0709

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 18 CR 1073001 |
| | ) | |
| ADAM WARD, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant, | ) | Judge Presiding. |

_____

JUSTICE GAMRATH delivered the judgment of the court.
Presiding Justice Tailor and Justice C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's conviction and sentence for aggravated battery where the evidence at trial is sufficient to support the jury's verdict, trial counsel was not ineffective, the prosecutor's rebuttal closing argument was not improper, and the trial court did not abuse its discretion in imposing sentence.

¶ 2    Defendant Adam Ward was charged with attempt first degree murder and aggravated battery with a firearm following the shooting of Ashley Stinson on July 2, 2018. A jury found Ward guilty of aggravated battery and not guilty of attempt first degree murder. The circuit court sentenced Ward to 12 years' imprisonment followed by three years' mandatory supervised release. On appeal, Ward contends: (1) the State failed to prove him guilty of aggravated battery; (2) trial

counsel provided ineffective assistance by failing to introduce a prior consistent statement he made during a 911 call; (3) the State's comments in rebuttal closing argument amounted to prosecutorial misconduct; and (4) the trial court's imposition of a 12-year sentence was excessive.[1] We affirm the judgment of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Pre-Trial

¶ 5        Prior to trial, the State filed a motion *in limine* seeking to bar evidence of statements Ward made when he called 911 after the shooting claiming the firearm accidentally discharged. The State argued admission of the statements would violate the rule against hearsay "since the 911 call contains prior consistent statements" and no exception applies. In response, defense counsel argued an exception applies because "the whole point of the 911 call is to render aid" and "it goes to his mental status [*sic*] on whether this was an accident or intentional." The trial court stated: "For the Defense it's hearsay. If the State intends to use it, it's not, but for [the defense] it's hearsay and it could be a prior consistent statement *** but at this point I haven't heard any hearsay exception." Defense counsel then asserted "it's an excited utterance *** an exception to the hearsay rule" and "this is not a prior consistent statement." The trial court granted defense counsel's request to brief the issue.

¶ 6        Counsel filed a response to the State's motion, arguing the statements are admissible as excited utterances under Illinois Rule of Evidence 803(2), statements of Ward's then existing state of mind under Rule 803(3), or statements for purpose of medical diagnosis under Rule 803(4). In reply, the State argued the statements are prior consistent statements and that Ward waited 47 seconds on the 911 call before he first stated the gun went off accidentally. The trial court granted the State's motion, finding the statements in the 911 call are inadmissible under the hearsay

---

[1] In Ward's reply brief, he withdrew his challenge to three years' mandatory supervised release.

exceptions. However, the court noted, "[I]f it's a proper prior consistent statement, if there's some fabrication or something like that, I think that could be at play here. But I don't have that instance right now. So for the reasons the State is asking to bar it, it's being barred, but I'm reserving a ruling if I need to address this on some other grounds."

¶ 7                                                          B. Jury Trial

¶ 8        At trial, the evidence showed Stinson and Ward worked together at Protein Bar and began dating in 2017. The morning of July 2, 2018, they commuted to work together and met after work at a nearby parking garage around 5:00 p.m. to go back to Ward's apartment. The pair stopped at Burger King to get food. Stinson ordered food at the drive-thru, but Ward said he "didn't want anything." On the drive to Ward's apartment, he began to eat Stinson's food and the two started arguing.

¶ 9        Stinson testified they arrived at Ward's apartment around 6:10 p.m. and were "still arguing about the Burger King." Ward got out of the car, but Stinson stayed inside because she was upset. Ward stood outside Stinson's door and questioned why she was not getting out of the car. Stinson eventually got out and as they were walking to the apartment Ward "ball[ed]" up her food and threw it on the ground. Ward told her he did it because Stinson said she did not want the food. Stinson replied that she said she didn't want it because she was "just mad at the moment."

¶ 10        When they got to Ward's apartment, Stinson began changing out of her work clothes and Ward "left out the door." Ward took his phone with him and Stinson put his wallet and keys inside her purse because she "didn't want him to leave." Stinson sat on the couch and played with her phone. Around two minutes later, Ward returned to the apartment, sat on the couch, and "started to pull out his gun." Stinson said she was not alarmed because the gun "was always out" and Ward often "play[ed] around" with it.

¶ 11    As they sat on the couch, Ward asked Stinson to order food. Stinson laughed because she "couldn't believe he was asking that" after he had eaten her food and thrown it away. She told him "no." Ward then counted down from four (four, three, two, one) and shot Stinson in the right breast.

¶ 12    Ward "started panicking and apologizing," tried to put clothes on Stinson, and called for an ambulance. The ambulance transported Stinson to Christ Advocate Hospital. At the hospital, Stinson was unable to talk, walk, or feel her legs. She remained at Christ Advocate for three weeks and had three surgeries but was rendered completely paraplegic. The bullet was not removed from her body. Stinson was transferred to Kindred Hospital for almost two months. Her father stayed with her because she was still unable to talk. After Kindred, Stinson went to Schwab Rehab Center before returning home. At the time of trial, Stinson was still confined to a wheelchair and unable to walk. Dr. David McElmeel testified that Stinson is permanently disabled.

¶ 13    At the crime scene, police recovered Ward's Smith & Wesson SD9 9-millimeter semi-automatic handgun in slide lock, an empty magazine with a 15-round capacity, an expended shell casing head stamped "F.C. 9MM Luger," a black lock box containing a red trigger cable, and a loaded magazine with an unknown number of live rounds and a 16-round capacity from the lock box. The handgun has three safety features: (1) a loaded chamber indicator, which is "a cutout on the top of the slide that allows the user to view inside that opening to see if there's a cartridge in the chamber"; (2) a firing block pin, which is "a piece of the firing pin block that prevents the fire pin from moving forward unless its pushed out of the way *** blocking the firing pin until the trigger is pulled"; and (3) a trigger safety, where the trigger is composed of two separate parts hinged together and require the user "push on the toggle portion on the bottom of the trigger to allow it to clear and move rearward."

¶ 14    Gina Kotscharjan, a forensic scientist with the Illinois State Police, highlighted the trigger safety on Ward's gun and described it as a triangular piece at the rear of the trigger that blocks the

trigger being pulled unless it is moved out of the way with a finger or some other item. Because the gun does not have a thumb safety or magazine safety, the gun could fire with or without a magazine in it. Kotscharjan examined the "last round hold open" feature on the gun and said, in general, when the last round is fired in a gun with this feature, "the slide will stay to the rear or opened and that helps to serve as a visual indicator that the firearm is out of ammunition." Kotscharjan's test of this feature on Ward's gun revealed that the slide lock stays open only when the magazine is inserted.

¶ 15    In sum, Kotscharjan concluded Ward's gun is operable, has three safeties (a trigger safety, a firing pin block, and loaded chamber indicator), the cartridge case recovered by police was fired by the gun, and the trigger pull weight range is between seven and seven-and-one-half pounds.

¶ 16    On cross-examination, Kotscharjan acknowledged when she put a dummy round into the chamber, she could see a sliver of it through the opening of the loaded chamber indicator. Kotscharjan was shown a safety and instruction manual for the Smith & Wesson SD9 VE handgun. She noted the manual is for a slightly different but similar model weapon as Ward's gun. The manual contains a warning explaining "stag[ing] the trigger in anticipation of firing a shot *** can reduce the user's control of the handgun and can result in an unintentional discharge." Staging is "the act of pulling the trigger rearward toward – stopping just short of – the point where the handgun fires." Defense counsel then asked if "slamming" a magazine into the gun would cause an "unintentional chamber of a bullet." Kotscharjan testified, "When the magazine is inserted into the firearm and the slide is rearward when the slide moves forward [] it strips the cartridge off the magazine and into the chamber and it's often held rearward with the slide stop or if that slide becomes jostled or bumped or something and it closes as you're entering the magazine that would put, potentially, a round into the chamber."

¶ 17        Chicago Police Detective Robert Graves collected gunshot residue (GSR) from both of Ward's hands around 12:40 a.m. on July 3, 2018. Scott Rochowicz, a forensic scientist, tested the samples and concluded that Ward "either discharged a firearm, was in close proximity to a firearm that was discharged or contacted a PGSR-related item," which is an object that already has GSR particles on it. Rochowicz's report indicated a higher grade of GSR particles on Ward's left hand than on his right. On redirect, the State asked, "When you're looking for a positive test does it matter which hand or item or body part the positive result comes from?" Rochowicz responded, "No. The results will be whatever findings that I am able to find *** There's too many variables involved as to why GSR may not have been deposited on a specific area."

¶ 18        After the State rested, Ward's attorney moved for a directed verdict, which the court denied. Ward then took the stand in his own defense.

¶ 19        At the time of trial, Ward was 33 years old. He has a master's and bachelor's degree and was working on a doctorate. Ward testified that on May 7, 2018, he went to Midwest Gun Range with his brother and Stinson and purchased a gun from Midwest Sporting Goods (MSG). Ward said he never read the manual and did not practice shooting the gun until he visited a gun range in Memphis over Memorial Day.

¶ 20        On July 2, 2018, the day of the shooting, Ward dropped Stinson off at work in the morning and picked her up that evening. The two planned to go to Ward's apartment, which was approximately 45 to 50 minutes away. Ward testified that on the way home, Stinson told Ward she was hungry, and they went to the drive through at Burger King. "Immediately" after they left Burger King, Stinson said she did not want the food anymore. Ward testified he was not "upset" with Stinson. When they arrived at Ward's apartment building, Ward started to get out of the car and asked Stinson if she wanted the food. When Stinson replied that she did not, Ward said he threw the food away in a garbage can.

¶ 21  Ward and Stinson walked in the apartment, changed clothes in the "little laundry room," and went to Ward's bedroom to take a nap. Ward recalled he woke up around 7:15 p.m. because a "Monday Night Raw" wrestling show was on television. Stinson joined him in the television room approximately 30 minutes later while Ward was packing to go on a trip the next day. Ward sat on the couch with his back "on the armrest but at an angle like facing out" towards the television. Stinson sat on the other end of the couch with her back on the armrest and legs across the couch "on top of" Ward. Ward did not recall who brought it up first, but the two decided it was time to eat. Ward asked Stinson to order food because "[s]he already had her phone in her hand."

¶ 22  While Stinson was on her phone, Ward pulled out his gun case from under the couch and "started playing with it." Ward testified he "wasn't pointing the gun at anything" but "just had it in [his] hands *** just like playing with the clip," also known as the magazine. Two magazines came with the gun, and Ward kept one empty and one full. When he pulled the gun out of the box, the full magazine was "halfway in" the gun, so when Ward picked it up "it could just fall right out." Ward "took the full one away and put it to the side" and continued "playing with the empty clip on the gun." Ward testified he held the gun in his nondominant left hand while playing with the cartridge in his right. Ward's finger was on the trigger safety, the top part of the trigger.

¶ 23  Ward testified, "I was just holding it there so it wouldn't go off or – it was just sticking, too, how it was used to doing." Then, "not even that long after that," the gun "just went off." Ward saw Stinson's facial reaction, dropped the gun, and reached for his phone. Ward was "panicking," and dialed 991 by mistake. After hearing "an emergency beeping," he hung up and called 911 directly. Ward applied pressure to Sinson's chest until the paramedics arrived. Ward testified he was not mad at Stinson and did not want to harm or kill her. Ward agreed to talk with police and submit to a GSR test.

¶ 24  On cross-examination, Ward acknowledged that when he spoke to the police on July 2,

2018, he told them, "I uncocked it back and that's when the trigger went off." He also told police that his gun had a red wire lock through it when he took the gun out of the case. The prosecutor asked, "In order to get this red wire lock through that handgun the gun would have to be in slide-lock, right?" Ward responded at trial that he did "[n]ot really" understand what "slide-lock" meant. Yet, he told police the "gun was in slide-lock with the red wire lock through it," and when he took the gun out it was fully locked. He also demonstrated with his hands how to use the wire lock through the gun. When asked to explain what he told police, Ward stated, "I was trying to sound smarter than I actually am."

¶ 25        Ward testified at trial that when he picked up the gun from the case, the slide on top of the gun was closed. However, Ward told police, "The rack was still in slide-lock. Before I did anything else I put it down so before I put the clip in it wasn't back. I released the slide and it went forward. Then I loaded one [magazine] in." Ward also told police he "dropped it right back out and then *** put an empty one in and took it right back out." At trial, Ward testified he did not put a loaded magazine into the gun, even though he told police he had put a loaded magazine into the gun.

¶ 26        Ward testified his left arm was facing the window behind the couch while he was sitting on it. Ward told police he was "facing the window." Ward testified his gun has a safety on the top, which shows a sliver of the bullet when viewed from the top of the gun. Ward told police that "the safety is at the top of the gun so that's why [he] was holding it and *** trying to pull it back and [he] pulled the trigger at the same time." Although Ward testified at trial that he did not pull the trigger, he told police "when I was pulling [the trigger safety] I pulled the trigger back first rather than the back first and that's when the shot when off."

¶ 27        Ward testified he had no knowledge of firearms before he bought the gun in May 2018. A "range safety person" told him "[h]ow to load it, how to fire it." The person did not show Ward how to clear the gun or make sure it was safe but explained how to keep the gun pointed "down

range." Ward knew he was "not supposed to aim at something [he didn't] intend to shoot." Ward testified he did not know he should "always treat a gun as if it's loaded" and should never place his finger on the trigger unless he intended to fire. Ward acknowledged he "went over" these rules at MSG when he bought the gun in May.

¶ 28     On redirect examination, Ward testified he did not point the gun at Stinson, did not have a specific target, and was not aiming the gun at anything. Ward picked up the gun from under the couch that night to "familiarize" himself with the firearm. When Ward talked to police on July 2, 2018, he told them he did not mean to shoot Stinson.

¶ 29     Following closing arguments, the jury found Ward guilty of aggravated battery and not guilty of attempt first degree murder. The trial court denied Ward's motion for judgment notwithstanding the verdict and for new trial in which he argued the evidence is insufficient to prove him guilty and the trial court erred in granting the State's motion *in limine* to preclude his statements made during the 911 call.

¶ 30                                    C. Sentencing

¶ 31     At Ward's sentencing hearing, the parties agreed the statutory minimum sentence for aggravated battery as charged was six years' imprisonment and the maximum sentence was 30 years' imprisonment and a three-year period of mandatory supervised release.

¶ 32     In aggravation, the State pointed out Ward's conduct caused serious harm: "Aside from death, there is nothing more serious than what the defendant did to [Stinson] that day, shooting her in the chest and confining her to a wheelchair for the rest of her life." The State acknowledged Ward had no criminal history or prior delinquency and "has led a law-abiding life for a substantial period of time," but argued "the other 18 [statutory] factors in mitigation don't apply." The State argued Ward was untruthful while testifying and "[h]e never stated this was an accident. He never stated this was a mistake" and he never showed "one single shred of remorse." The State also

presented victim impact statements from Stinson and Stinson's aunt.

¶ 33    Ward's sisters testified in mitigation. Defense counsel, who is Ward's cousin, also testified in mitigation. Defense counsel argued, "[T]he purpose of our system *** is not to punish people, it's for rehabilitation." Counsel argued Ward is unlikely to reoffend and requested the minimum sentence. Speaking in allocution Ward apologized to Stinson and her family, stated he never meant to hurt her, and asked for forgiveness.

¶ 34    After considering the statutory factors in aggravation and mitigation, the circuit court sentenced Ward to 12 years' imprisonment followed by three years' mandatory supervised release. Ward now appeals.

¶ 35                            II. ANALYSIS

¶ 36    On appeal, Ward argues: (1) the State failed to prove him guilty of aggravated battery; (2) trial counsel provided ineffective assistance by failing to introduce a prior consistent statement he made during a 911 call; (3) the State's comments in rebuttal closing argument amounted to prosecutorial misconduct; and (4) the trial court's imposition of a 12-year sentence was excessive.

¶ 37                      A. Sufficiency of the Evidence

¶ 38    Ward argues the evidence is insufficient to show he intended to shoot and harm Stinson. In fact, he asserts the evidence "substantially corroborated" his testimony that he accidentally shot Stinson while playing with his new gun in his non-dominant left hand. As such, the State did not prove him guilty of aggravated battery with a firearm beyond a reasonable doubt. We disagree.

¶ 39    In reviewing the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is not our function to retry Ward or substitute our judgment for that of the jury on the weight given

to the evidence or credibility of witnesses. *People v. Brown*, 2013 IL 114196, ¶ 48. Nor must we

¶ 40    "search out all possible explanations consistent with innocence." *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007). "We will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 41    To prove Ward guilty of aggravated battery based on use of a firearm, the State had to show Ward, in committing a battery, knowingly discharged a firearm and caused injury to Stinson. 720 ILCS 5/12-3.05(e)(1) (West 2018). A person acts knowingly or with knowledge of the nature of their conduct when they are "consciously aware" their conduct is of the nature "described by the statute defining the offense." 720 ILCS 5/4-5(a) (West 2018). A person acts knowingly or with knowledge of the result of their conduct when they are "consciously aware that [bodily harm] is practically certain to be caused by [their] conduct." 720 ILCS 5/4-5(b) (West 2018). "It is not necessary that the State prove that the defendant intended the specific consequence that occurred." *People v. Isunza*, 396 Ill. App. 3d 127, 132 (2009). Instead, a person engaged in a wrongful act is responsible even for a result not intended where the result is a "natural and probable consequence" of the wrongful conduct. *Id.* Due to its very nature, knowledge is usually proven by circumstantial evidence and, thus, may be inferred from the facts and circumstances in the case. *People v. Slabon*, 2018 IL App (1st) 150149, ¶ 35.

¶ 42    Whether Ward acted with knowledge is a fact question for the jury to decide. *People v. Jones*, 2023 IL 127810, ¶ 27. Ward disputes the jury's finding of knowledge, claiming instead that he did not knowingly discharge a firearm, and that he did not intend to shoot Stinson. Viewing the evidence in the light most favorable to the prosecution, as we must, we find that the jury reasonably could have found Ward acted with knowledge, and that the State proved the elements of aggravated battery beyond a reasonable doubt.

¶ 43    The evidence establishes Stinson and Ward were in a dating relationship and Stinson frequently spent time at Ward's apartment. On May 7, 2018, Ward, Stinson, and Ward's brother went to a gun range where Ward then purchased a firearm with a valid FOID Card. While at the gun range, an employee told Ward "[h]ow to load it, how to fire" the gun. The employee explained how to keep the gun pointed "down range," told Ward he should "always treat a gun as if it's loaded," and that he should never place his finger on the trigger unless he intends to fire. Stinson testified that Ward frequently "play[ed] around" with the gun at home. Ward also testified he would "pull it out on random occasions" because he was "excited to actually have one for the first time."

¶ 44    The evening of July 2, 2018, Ward and Stinson were driving back to his apartment when an argument started over fast food. When they got to Ward's apartment, he got out of the car and threw the food on the ground while Stinson stayed inside because she was "upset." When they got to Ward's apartment, Stinson sat on the couch playing with her phone and Ward joined a few minutes later. Ward pulled out his gun from the side of the couch. Ward asked Stinson to order food on her phone and she laughed and said "no" because Ward ate her food and threw it away when they returned home. While looking at her phone, Stinson heard Ward countdown from four (four, three, two, one) and then shot her in the right breast. Viewed in the light most favorable to the prosecution, a reasonable trier of fact could find Ward knowingly shot Stinson after warning her with a countdown from four.

¶ 45    Ward maintains the gun "just went off" and he did not intend to shoot Stinson. Ward testified when he retrieved the gun from beneath his couch, a full magazine was "halfway in" the gun and "could just fall right out." Ward testified he pulled the full magazine out, "put it to the side," and continued playing with another magazine that was empty. According to Ward, he held the gun in his nondominant left hand with his finger on the trigger safety. He had the empty

magazine in his right hand. Ward explained he "was just holding it there so it wouldn't go off or – it was just sticking, too, how it was used to doing." Then, the gun "just went off."

¶ 46     However, this version of events is at odds with what Ward admittedly told police the night of the shooting. Ward told police when he took the gun out from beneath the couch, the gun was in the box and "fully locked up" with a red wire lock through the gun that would not allow a magazine to be inserted into the gun. Ward said the gun was in "slide-lock," which was the only way the red wire lock could be used. Ward removed the lock, released the slide, and inserted the loaded magazine. Ward told police, "[W]hen I was pulling [the trigger safety] I pulled the trigger back first rather than the back first and that's when the shot when off." A reasonable jury could have credited these statements as true and discounted his trial testimony that the gun just went off and he did not pull the trigger.

¶ 47     Further, at trial, Ward claimed he did not understand what "slide-lock" was and explained he told police this because he was "trying to sound smarter" than he was. However, it was up to the jury, as trier of fact, to resolve discrepancies in the testimony, assess the credibility of the witnesses, and determine the appropriate weight of the evidence. *People v. Evans*, 209 Ill. 2d 194, 211 (2004). The jury was " 'free to accept or reject as much or as little of a witness's testimony as it please[d].' " *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67 (quoting *People v. McCarter*, 2011 IL App (1st) 092864, ¶ 22). Based on his statements to the police, the jury could reasonably believe Ward was more familiar with his gun than he let on at trial and, thus, conclude he knowingly shot Stinson. We find no reason to disturb the jury's finding.

Ward contends Rochowicz's testimony corroborates his claim the shooting was an accident. Even if so, this is just one piece of evidence. To be found guilty, the evidence is taken as a whole. Each piece of evidence need not be satisfied beyond a reasonable doubt. *Jackson*, 232 Ill. 2d at 281.

¶ 48    Regardless, we note, Rochowicz found GSR on both of Ward's hands. Although more residue was detected on Ward's left hand, Rochowicz did not conclude the gun was in fact in Ward's left hand when it fired. Rather, he said there were "too many variables involved as to why GSR may not have been deposited on a specific area." Yet, even if the gun was in Ward's nondominant left hand, as Ward alone claims, the jury reasonably could have believed Ward was comfortable enough using his left hand to manipulate the trigger safety while using his right hand to play with the empty gun magazine. This does not undermine the jury's determination that he knowingly shot Stinson.

¶ 49    Ward also argues it "defies common sense that Ward would implicitly threaten Stinson for no apparent reason" by counting down from four before pulling the trigger. However, this is what Stinson testified to, and it was the jury's job, not ours, to assess her credibility. Although she testified Ward was not upset or angry over the Burger King incident, when Stinson refused to order food for them while on the couch and told Ward "no," he may have been. The testimony shows immediately after Stinson said "no," Ward counted down four, three, two, one, and fired the gun. This evidence, viewed in the light most favorable to the prosecution, provides a sensible inference that Ward knowingly harmed Stinson after counting backwards from four.

¶ 50    Ward's attempt to equate the facts of this case with those of *People v. Olivieri*, 2016 IL App (1st) 152137, is unavailing. In *Olivieri*, the defendant was charged with reckless discharge of a firearm after his gun went off and fired a round into a wall he shared with his neighbor. *Id.* ¶ 4. In reversing Olivieri's conviction, we found he "accidentally pulled the trigger while attempting to unload the pistol to make it safe." *Id.* ¶ 30. Olivieri did not point the gun at someone seated next to him. Nor did he count down from four as a prelude to the shot fired.

¶ 51    Finally, we reject Ward's assertion that Stinson's serious injury alone "provid[ed] her with a motive to falsely testify against Ward." There is nothing in the record to support Ward's

suggestion that Stinson had a dishonest motive for testifying. The jury heard the testimony of Ward and Stinson, judged their credibility, observed their manner and demeanors, and resolved conflicts in their testimony. After reviewing all the evidence and reasonable inferences drawn therefrom in the light most favorable to the State, we find no reason to disturb the jury's determination.

¶ 52                               B. Ineffective Assistance of Counsel

¶ 53        Putting aside Ward's sufficiency of evidence claim, Ward argues his trial counsel was ineffective for failing to argue that his statement during the 911 call was admissible as a prior consistent statement. Specifically, Ward said on the 911 call, "the gun accidentally discharged." Ward argues this statement should have been introduced to rebut the prosecution's suggestion that his accidental discharge explanation was a recent fabrication.

¶ 54        A defendant alleging ineffective assistance of counsel "must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "A reasonable probability is a probability which undermines confidence in the outcome of the trial." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 84. "Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim." *Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland*, 466 U.S. at 697).

¶ 55        If an ineffective assistance of counsel claim may be disposed of on the grounds of lack of sufficient prejudice, the court need not consider the quality of the attorney's performance. *Strickland*, 466 U.S. at 697. Effective assistance of counsel refers to competent, not perfect, representation. *People v. Easley*, 192 Ill. 2d 307, 344 (2000). "*Strickland* requires only that a defendant receive a fair trial—a trial free of errors so egregious that they probably caused the

conviction." *People v. Short*, 2014 IL App (1st) 121262, ¶ 93. Here, we need not consider the quality of counsel's performance because the record shows Ward was convicted based on overwhelming evidence, not on any alleged deficiency by his trial counsel, and he cannot demonstrate he was prejudiced by counsel's performance.

¶ 56     At trial, Stinson and Ward both acknowledged Ward attempted to help Stinson immediately after the shooting. Specifically, Stinson testified Ward "started panicking and apologizing" and tried to put her clothes on and pick her up before eventually calling 911. Importantly, Ward testified at trial that when talked to police on July 2, 2018, the day of the shooting, he told them he did not intend to shoot Stinson. The jury understood immediately after the shooting, Ward tried to help Stinson by calling 911 and administering aid. Ward also told police the shooting was an accident. Any benefit that would have been gained from Ward's repetitive statement to 911 that the gun accidentally discharged would be minimal. Accordingly, Ward was not prejudiced by his counsel's failure to introduce this prior consistent statement based on the substantial evidence against him and the minimal benefit of this evidence. See *Short*, 2014 IL App (1st) 121262, ¶¶ 94, 104.

### C. Closing Argument

¶ 57     Ward also argues the State's rebuttal closing argument was improper because the prosecutor's comment suggested Ward was "calculated and controlling" without evidentiary support. Ward admits he failed to preserve this claim by raising it in a posttrial motion but seeks review under the doctrine of plain error. In response, the State argues there was no error where the prosecutor's comments were properly based on the evidence or reasonable inferences therefrom, and plain error does not apply. We agree.

¶ 58     The plain error doctrine permits a reviewing court to consider an unpreserved error when a clear or obvious error occurred and either (1) "the evidence is so closely balanced that the error

alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Under either prong, the burden of persuasion rests with the defendant. *People v. Sargent*, 239 Ill. 2d 166, 190 (2010).

¶ 59       Before considering whether plain error applies, we must first determine whether any error occurred. *People v. Glasper*, 234 Ill. 2d 173, 203-04 (2009). A prosecutor has wide latitude regarding the content of closing and rebuttal arguments and may comment on evidence and any fair and reasonable inferences the evidence may yield. *People v. Runge*, 234 Ill. 2d 68, 142 (2009). We must consider the entire closing argument, rather than focusing on selected phrases or remarks, as Ward asks us to do. *Id.* We will find reversible error "only if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error." *Id.* Ward has not met his burden of persuasion.

¶ 60       The prosecutor's remark of which Ward complains, is as follows: "I think we can all agree that the defendant was not mad. But what's important here is that he was calculating, he was controlling." This comment was made during the State's rebuttal closing argument, which came on the heels of the prosecutor arguing:

> "Ashley told you how this started over Burger King. She wanted to get something to eat. He drove her. And then he started eating her food, and she got upset. And then she refused to get out of the car. Eventually, they went inside, and he threw her food on the ground. And she was upset; she told you she argued with him about it. But she did say that once they got back into the apartment, they weren't arguing about it anymore. But when the defendant later asked her, while sitting on that couch and holding that gun, to order her [*sic*] food, it immediately sparked up that same argument they had just had. And you heard

what she said. You're asking me to order you food after—[2] You're asking me to order you food after what just happened. That's when the argument picks back up at that moment. And she laughs at him. And she told you it wasn't like a joke laugh, like, funny, he was being hilarious. It was, like, I cannot believe you have the audacity to ask me this after you just acted the way you did with my food, even though it was hours earlier. Okay? And she looks down, and that's when the defendant does this countdown and pulls the trigger. Because who is she to laugh at him? Who is she to behave that way? He's the one in control, making the decisions. And that's what shows his intent."

¶ 61    Notably, before the State's rebuttal closing argument, defense counsel argued in closing: "[W]hat's not in dispute is [Ward]'s not mad. He's not mad. His demeanor is not upset. They're not arguing."

¶ 62    The prosecutor's comment that Ward was calculating and controlling was in direct response to defense counsel's argument above. See *Glasper*, 234 Ill. 2d at 204 ("Statements will not be held improper if they were provoked or invited by the defense counsel's argument."). It was based on the totality of the evidence and reasonable inferences drawn from Stinson's testimony, not based on the prosecutor's own personal views or incompetent evidence. *Cf.*, *People v. Smith*, 141 Ill. 2d 40 (1990) (prosecutor erred by commenting on incompetent evidence of an alleged gang-related motive); *People v. Anderson*, 2018 IL App (1st) 150931, ¶ 27 (prosecutor erred during closing argument by emphasizing "its unproven assertions" and "gratuitously add[ing] to them" by incorrectly stating a witness testified to the grand jury about a threat); see also *People v. Deramus*, 2014 IL App (1st) 130995, ¶ 51 ("In order for a prosecutor's comments regarding a witness's credibility to be improper, 'he must *explicitly* state that he is asserting his personal

---

[2] Defense counsel objected at this point. The court overruled the objection and instructed the jury, "Anything the lawyers say that is not supported by the evidence should be disregarded."

views.' " (Emphasis in original)). Because the prosecutor's comment was not improper, the plain error doctrine does not permit review. And because we find no error or improper conduct, we reject Ward's contention that his defense counsel was ineffective for failing to preserve the issue. See *People v. Wasmund*, 2022 IL App (5th) 190525, ¶ 106.

¶ 63                                    D. Sentencing

¶ 64        Lastly, Ward contends the trial court abused its discretion in sentencing him to 12 years' imprisonment. Ward asks this court to reduce his sentence to six years' under Illinois Supreme Court Rule 615(b)(4), or to vacate his sentence and remand for a new sentencing hearing. We decline Ward's request, for it is not our function to reweigh the evidence in aggravation and mitigation and substitute our judgment for that of the trial court. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). We will overturn a sentence only where the court has abused its discretion. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19.

¶ 65        The Illinois Constitution states "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To achieve the constitutionally mandated balance between the retributive and rehabilitative purposes of punishment, the trial court must carefully consider all aggravating and mitigating factors, including: "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). The trial court, not the reviewing court, is in the best position to assess these factors because it has observed the defendant and the proceedings. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). Accordingly, "[t]he trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *Id.* at 212.

¶ 66     We cannot say the trial court abused its discretion when it sentenced Ward to 12 years' imprisonment. Aggravated battery with a firearm is a Class X felony punishable by six to 30 years' imprisonment. 720 ILCS 5/12-3.05(e)(1), (h) (West 2012); 730 ILCS 5/5-4.5-25(a) (West 2012). The sentence imposed is within the applicable sentencing range and presumptively proper. *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16. This presumption will be rebutted only if Ward makes an affirmative showing the sentence greatly departs from the spirit and purpose of the law or the constitutional guidelines. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). Ward has failed to make this showing.

¶ 67     Ward argues the trial court failed to "adequately fashion a sentence with Ward's rehabilitative potential as its objective." Absent some affirmative indication in the record to the contrary other than the sentence itself, we must presume the court considered all mitigating factors. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. The trial court expressly recognized Ward "has no criminal history" and believed the offense "is unlikely to reoccur again." The court also acknowledged there was a "substantial amount of mitigation," and recognized Ward's "substantial" family support was "a very important consideration." The court stated:

> "This is a difficult decision, and I will tell the parties that plainly because with everything I've heard both in aggravation and mitigation because Mr. Ward is someone who is not the ordinary defendant.
>
> He is a normal, useful member of society that -- and I don't mean that to denigrate any person who is a defendant, but what I mean is that he is someone who could've been a lawyer. He could've been arguing this case either as a prosecutor or a defense lawyer had he chosen to continue his law studies.
>
> He is somebody who could've been anybody or anything he wanted. I don't think he wanted to be a defendant but somehow he became one, but now I have to sentence him."

The court explicitly recognized Ward's rehabilitative potential but ultimately determined it was outweighed by other considerations, including the seriousness of the offense.

¶ 68 Illinois courts have declared the seriousness of the offense is the most important factor in fashioning a sentence. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123; *Alexander*, 239 Ill. 2d at 214. A court is "not required to give greater weight to mitigating factors than to the seriousness of the offense." *Harmon*, 2015 IL App (1st) 122345, ¶ 123. Furthermore, the presence of mitigating factors does not "either require a minimum sentence or preclude a maximum sentence." *Id.*

¶ 69 Statutory factors in aggravation a trial court must consider include "the defendant's conduct caused or threatened serious harm." 730 ILCS 5/5-5-3.2(a)(1) (West 2020). In this case, the trial court found the shooting was "not some sort of mistake, *** this was a knowing discharge" resulting in Stinson's permanent paralysis and confinement to a wheelchair. The trial court also found "the sentence is necessary to deter others from committing the same crime." See 730 ILCS 5/5-5-3.2(a)(7) (West 2020). Specifically, the court stated, "[Y]ou can't treat a gun as a toy, right, and at best play with it as cavalierly as Mr. Ward did as a defense suggests, or at worst, as the State initially charged him but the jury acquitted him of intending to kill Ms. Stinson." These comments show the trial court carefully considered the evidence and fashioned an appropriate sentence within the statutory range that balanced the seriousness of the offense with Ward's background and other mitigating evidence. The court did not abuse its discretion in sentencing Ward to 12 years' imprisonment.

¶ 70 III. CONCLUSION

¶ 71 For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 72 Affirmed.